Hillsborough,
No. 5375.

SELMA SIGEL & a.

v.

BOSTON & MAINE RAILROAD & a.

Argued November 3, 1965.
Decided January 31, 1966.

*Devine, Millimet, McDonough, Stahl & Branch* (*Mr. Joseph A. Millimet* orally), for the plaintiffs Selma Sigel and Saul Sigel and Matthias J. Reynolds, administrator of the estate of John S. Wilder.

*Upton, Sanders & Upton* (*Mr. John H. Sanders* orally), for the plaintiff Matthias J. Reynolds, administrator of the estate of John S. Wilder.

*McLane, Carleton, Graf, Greene & Brown* (*Mr. Kenneth F. Graf* orally), for the plaintiff Ida Detwiler.

*Harkaway & Barry* (*Mr. Aaron A. Harkaway* orally), for the plaintiff William P. Sullivan, administrator of the estates of Wrenn passengers.

*Wiggin, Nourie, Sundeen, Nassikas & Pingree* and *Sheehan, Phinney, Bass, Green & Bergevin* (*Mr. William L. Phinney* orally), for the plaintiff-defendant Boston & Maine Railroad.

*James L. Ryan* and *Hamblett, Kerrigan & Hamblett* and *Danais & Danais* for the plaintiff-defendant Leo J. Wrenn, administrator of the estate of Robert M. Wrenn.

*Burns, Bryant & Hinchey* and *Sweeney & Kelly* (*Mr. Robert E. Hinchey* orally), for the defendant Koppers Company, Inc.

BLANDIN, J. The defendant railroad, hereinafter referred to as the defendant, in its thorough and searching brief, argues that its motions for nonsuits and directed verdicts should have been granted. It advances several grounds for this position, which we will take up in order.

The first is that "There is no evidence whatsoever that the

Budd car's speed of 70 miles per hour over the crossing in itself caused, or helped to cause, the accident." The defendant says that from the moment the engineer knew or should have known that the deceased driver of the truck, Robert Wrenn, was not going to stop at the crossing, the accident was inevitable regardless of the train's speed. We believe this argument misses the point involved in the issue of speed. The Court's charge taken as a whole made it plain to the jury that the speed of 70 miles per hour, which was admitted by the railroad, was to be considered as an element in determining whether in all the circumstances the broad charge of negligence leveled against the railroad for failure to provide reasonably safe crossing protection was sustainable. This instruction was correct, provided that the record warranted it. *Stocker* v. *Railroad*, 83 N. H. 401, 405. In the case now before us, the evidence and all reasonable inferences therefrom, construed most favorably to the plaintiffs (*Leonard* v. *Manchester*, 96 N. H. 115), would permit the following findings by the jury:

The accident giving rise to these suits resulted from a collision between a Boston & Maine Railroad Buddliner, being passenger train No. 42, and a truck driven by Robert Wrenn, at about 8:30 A. M. on December 7, 1960. The Buddliner was proceeding southerly from Laconia to Boston. It collided with the truck, which was traveling westerly, at the Hills Ferry crossing in the northerly part of the city of Nashua. The track over which the train was running was part of the defendant railroad's main Montreal-Boston line. During each weekday fourteen Buddliners went over this crossing, seven of which were south bound and seven north bound. The south bound trains traveled over the crossing at 70 miles per hour and the north bound trains passed over it at a slower rate. Several freights also went over the crossing in each direction and on every weekday the "Nashua Switcher" proceeded over the crossing on its round trip from the Nashua station several miles south of the crossing to the premises of Koppers Company, Inc., located a quarter of a mile north of the crossing. The southbound Buddliners, in accordance with railroad rules, began slowing down a quarter of a mile south of the crossing so that one-half mile south of it they traveled at 30 miles per hour, at which speed they continued to the Nashua station.

At the time of the accident, the crossing was not and never had been equipped with any automatic signaling devices indi-

cating the approach of trains. A cross buck railroad crossing warning sign was located on the northerly side of the Hills Ferry Road about 100 feet west of the crossing. This was mounted on a pole about 10 feet high and bore the words "Railroad Crossing." Another sign attached below had the inscription "3 tracks." There were no railroad crossing signs on the east side of the crossing. The Hills Ferry Road, upon which Wrenn was traveling, leads off the Daniel Webster Highway and runs generally east and west, intersecting the railroad at a right angle. The crossing itself is about 17 feet wide. Motor vehicle access to it was by the Hills Ferry Road.

A large tract of land lying easterly of and adjacent to the tracks, bounded on the south by the Hills Ferry Road and on the east and northeast by the curving Merrimack River, was owned by the railroad and in 1923 a wood treating plant was built on the premises, which were then leased to a predecessor of the defendant Koppers Company, Inc. The leased area contained about nine miles of track, most of which were parallel to the main line. Koppers Company, Inc., which first leased the premises in 1944, was engaged in treating wood products. Three huge treating cylinders were located at the north end of the treating plant structure which in turn was 160 feet easterly of the main railroad line and 750 feet north of the crossing. There were numerous other structures, including a debarking or derosser plant situated easterly of the main plant, a gasoline storage tank at the south end of the main plant, several fuel oil tanks just east of it, an office building north of the main plant with a large parking area for vehicles, and a mill building northeast of the plant. Originally, there were 14 or 15 houses owned by Koppers Company, Inc. and occupied by its employees and their families on the west bank of the river, although these had decreased to two or three houses at the time of the accident.

Motor vehicle or pedestrian access to the Koppers plant for several years before the accident was via Hills Ferry Road and the crossing only. This road east of the crossing was a graveled, bumpy road, with numerous potholes, which immediately east of the crossing ran practically straight north parallel to the main line, past the main Koppers plant and beyond to the north. Throughout this large area there were stored in separate locations all types of processed wood material, most of which was owned by various customers, and some by Koppers itself. Railroads, whose treated ties were stored on the premises, included the

Boston & Maine, the Maine Central, the Bangor and Aroostook, and the Rutland. The utilities whose processed poles and other wood materials were stored there included the Western Electric, Boston Edison, Public Service Company of New Hampshire, and the New England Telephone & Telegraph Company. Thus, there were separate large piles of railroad ties, posts, poles, piling and other wood material throughout this whole area. Koppers' annual business at this location totaled $2,000,000, its largest treating contracts being those with the Boston & Maine, Bangor and Aroostook, and Rutland railroads.

At the time of the accident, the plant employed over 100 employees and the crossing was subjected to constant heavy use by great numbers and varieties of motor vehicles traveling to and from the plant area. This traffic included three trucks owned by Koppers; trucks and semi-trailers of other parties hauling posts, lumber, ties and poles up to 90 feet in length; tankers transporting gasoline, diesel, and fuel oil; trucks delivering cylinders of propane gas used by Koppers for branding purposes; vehicles of arriving and departing employees, most of whom used their own automobiles; pleasure vehicles of business visitors; vehicles delivering milk and groceries to the families living on the river; and occasional police and fire vehicles.

The land east of the railroad right-of-way and south of the Hills Ferry Road was owned by the city of Nashua, whose trucks, plows, and mechanical loaders also used the crossing, hauling loam to the city and plowing snow in the winter. In brief, the motor vehicle use of the crossing was constant.

The tracks at the crossing, from west to east, consisted of the southbound main line, the northbound main line, which switched onto the southbound approximately 200 feet north of the crossing, and an "A" track which ran northerly parallel to the main line for about 4,600 feet. The "gon" (gondola) track, which also ran north several thousand feet but not quite parallel to the main line, switched off "A" track as it ran over the crossing. The so-called "south ladder track," running east and west at the south end of the premises and the "north ladder" track running from northwest to southeast at the north end of the premises, served to switch between the numerous tracks which ran north and south and roughly parallel to the main line. These tracks within the yard itself thus consisted of the following from west to east: "A" track on which the Nashua switcher left off inbound cars, "B" track (which switched off "A" at a northerly point in the

yard) on which the Koppers' switcher left all outbound cars for removal by the Nashua switcher, "C" track (which switched off "B" at a more northerly point in the yard) used largely for storage purpose, the "gon" track which, as it proceeded away from the crossing, ran somewhat northeasterly; the crane track; the tram track; the scale track; the adzing track; the service (or mill) track; and tracks 1 through 8, the last being close to the river bank.

Loaded and unloaded cars were moved throughout this extensive system by Koppers' diesel powered switcher which was about 15' long, 8' wide, and 10' high above the rail, although the top of the 5' 8" long cab was about 12' above the rail. At the time of the accident the switcher was coupled to a 41' boxcar 9' wide and 13.7' high, this coupled unit being about 60' long. In its daily operation the switcher continually moved loaded and unloaded cars throughout the premises and, whenever there was occasion to shift in or out of the southerly section, the switcher, coupled to one or more cars, proceeded south and then north over the crossing, a movement which occurred three to ten times daily. The roadway leading from the crossing to the plant ran almost parallel to the main line and by means of a right angle turn intersected the crossing. The right angle turn was immediately adjacent to the crossing itself.

Robert Wrenn of Nashua, aged 29 at the time of the accident, had been engaged since November or December 1954 in and about the city in the sale of propane gas in cylinders to various customers, including Koppers. He carried two types of cylinders, the large ones containing 100 pounds of gas and the small, which Koppers used, containing 20 pounds of gas. Wrenn employed an assistant and deliveries to Koppers, in response to its requests, occurred about every 8 or 10 days, half the trips being made by Wrenn 'and the remainder by his assistant. Two trucks were used in the business, one being the 1960 Ford Model 350 truck involved in the accident, and the other a smaller Dodge. A special all steel body was custom built on the Ford at Wrenn's request. The sides of the body were provided with tie ups or rope links, the rope being used to hold rows of four cylinders each in a stable upright position. On December 7, at the time of the accident, Robert's wife, Patricia, aged 28, and their two children, a year and a half, and one month old, were with him. When the collision occurred, the truck was loaded with 29 large 100-pound cylinders, some of which were filled with propane gas.

The train involved, carrying about 40 passengers, consisted of a single Buddliner unit which, by timetable, left Laconia at 7:15 A. M., arrived at Concord at 8, arrived at Manchester at 8:23, passed the Koppers plant at 8:38 and came to Nashua at 8:42. The engineer, fireman and trainman who made up the crew were experienced personnel familiar with the crossing.

On the morning of December 7, 1960, the Buddliner left Laconia on schedule. At about 7:30 A. M. Robert Wrenn, in response to a telephone request from Koppers the day before, drove his Ford truck to the plant to pick up small empty gas cylinders for replacement with similar full cylinders. He picked them up at the office of Mitchell, the Koppers pole yard foreman, located east of the mill building which in turn was northeast of the treating plant. Shortly after this, Wrenn's truck was seen crossing from east to west over the "middle fire lane" driveway which was 500 to 600 feet north of the main plant.

At 8 A. M., the Buddliner arrived at Concord. It left Manchester at 8:23 A. M. At about this time, Wrenn again drove to the Koppers premises and, after traveling over a road leading from the south ladder northeasterly to the post rosser, stopped again in the vicinity of Mitchell's office. Just before he stopped, the Koppers switcher, coupled to a boxcar, moved past southerly on either the service (mill) track or track #1 toward the south ladder for the purpose of traveling via the gon track to track B. Wrenn delivered four or five small cylinders to Mitchell. At this time, Mrs. Wrenn was seated on the right side of the truck, the windows of which were closed. One child was in her lap and the other in the middle of the seat. Wrenn drove northerly on the road which ran a little distance north of the main plant, turned west across the tracks via the middle "fire lane" and onto the road which ran south along the west side of the treating plant and thence to the Hills Ferry crossing.

The Buddliner's timetable prescribed a speed of 70 m.p.h. during the run commencing south of Goffs Falls to a point about one-quarter mile south of the crossing, and the train carrying about 40 passengers was approaching the crossing at this speed.

The Koppers switcher, with engineer Scully and brakeman Briggs aboard, backed up southerly on the south ladder and then over the gon switch. The switcher and boxcar, still moving, were almost over this switch when Scully saw the Wrenn truck traveling over the south ladder on the road leading to the crossing. At that time Scully, who was in the cab of the switcher, was facing north, and he heard the Buddliner whistle. The Wrenn

truck was then 150 to 200 feet north of him. Scully described the whistle as a long, continuous blast. The truck continued at about 15 to 20 m.p.h., traveling southerly so that the backs of the driver and other occupants were toward the direction from which the train was coming. As the truck approached the switcher, Scully opened the window on the east side of the cab, "stuck his head out," and blew the switcher air whistle "as a warning to let the occupants of the truck know that the Buddliner was coming." At this point the truck was about 35 to 40 feet east of the switcher, the whistle of which kept blowing almost to the time of the collision. As the truck approached and passed by the switcher, Scully saw that a woman, seated on the right side of the truck cab, was "looking back and forth at the operator," but he could not recall whether she looked at the switcher. The switcher stopped with the rear end of the boxcar a few feet south of the gon switch and Scully saw the truck making the turn onto the crossing. He looked up the track and saw the Buddliner (which previously he had seen opposite the whistling post), now about 150 feet north of the crossing, approaching at 70 m.p.h. He immediately looked at the crossing and saw the truck on the southbound main line being struck by the train. The Buddliner came to a stop about one-third of a mile south of the crossing.

Briggs, the brakeman of the Koppers switcher, who was riding in the cab, saw the truck approaching 50 to 70 feet away at an estimated speed of 15 m.p.h. He also observed that a lady was seated as a passenger in the truck, but he neither saw the approaching Buddliner nor heard its whistle. He next heard a noise in the vicinity of the crossing which he thought to be an explosion. Shortly thereafter, he walked southerly on the main line and saw the bodies of Mr. Wrenn, the two children, and Mrs. Wrenn lying a short way south of the crossing on the west side of the track.

Aubut, the Buddliner engineer, was seated at the controls on the right side of the cab with his foot on the dead-man pedal as the Buddliner approached the crossing. As it rounded the curve a quarter mile north of the whistle post, the 3-light signal located about 350 feet north of the crossing showed a top green light and two bottom red lights, which signaled a continued speed of 70 m.p.h. If, on the other hand, the two bottom lights had been yellow, an immediate speed reduction to 35 m.p.h. would have been signaled.

He blew the first long whistle at the whistle post and when he started the second long whistle he first saw the Wrenn truck which was traveling south opposite the middle of the treating plant building. Immediately after seeing the truck, Aubut saw the Koppers switcher and boxcar stopped near the crossing on, as it appeared to Aubut, either the gon or A track where he previously had observed the switcher on a few occasions. The truck then disappeared behind the switcher and boxcar and reappeared only when it was completing the turn onto the crossing without any change of speed, which Aubut estimated at 25 m.p.h. When the Buddliner was about 25 feet from the crossing Aubut, realizing the truck was not going to stop, took his foot off the dead-man pedal, thereby applying the emergency air brakes. The Buddliner then struck the truck in the middle of the right side.

Carl Affeldt, New England district manager of the Koppers Company from 1945 to 1955, had had yearly discussions concerning the Hills Ferry Crossing with the vice-president of the Boston & Maine Railroad in charge of purchases & stores. These discussions regarding "the hazardous condition of the crossing" were initiated by the railroad. The railroad was "concerned about all vehicles going in and out of that plant . . . being hit by a train." The Koppers Company also considered that the crossing was "dangerous." The railroad "considered the crossing dangerous and proposed that some lights be installed." The cost of these flashers was estimated by the railroad to be $4,000, and Koppers offered to pay one half of the cost, but the railroad would not pay any part of it. As mentioned earlier, no automatic signaling devices to warn traffic of the approach of trains have ever been installed at the crossing.

The construction of the Wrenn truck was such that Robert had a view of only 92° to 93° to his right, and as he drove south on the exit road from the tie plant parallel to the track, when he was about 77 feet from the crossing he could see the track north of the crossing for a distance of only 60 to 70 feet. At that moment, the front of the Buddliner was some 462 feet north of the crossing and far beyond his vision.

There was evidence that the crossing protection did not comply with standards of good practice either in New Hampshire or the nation for the intersection of roads and railroads at grade crossings. For some years prior to the accident, the railroad had been aware that the crossing was dangerous.

In this state of the record, it appears that the issues of speed and what reasonable care required as to crossing protection were closely interrelated. *Dahar* v. *Railroad*, 95 N. H. 464, 469. In *Dahar*, the facts were not as favorable to the plaintiff as in the present case. However, the court there held that the question whether a speed of 50 m.p.h. was negligent was properly submitted to the jury. The language of the opinion seems particularly applicable to the situation before us. In overruling the defendant's motions for a nonsuit and directed verdict in *Dahar*, the court said (*Id.*, 468, 469):

"Despite indicated deficiencies with respect to the use of the crossing [which do not exist in the case before us] the evidence was nevertheless sufficient to warrant submission to the jury of the issues of the speed of the train, and the need for additional crossing protection. The speed at which trains are operated over a crossing bears directly upon the extent of protection reasonably to be required. In this case, because of the angle of intersection with the highway, greater protection might reasonably be considered necessary than in the case of a right angle intersection. *Cf. Despres* v. *Railroad, supra.* The risk of accident and hence the need for special protection would also increase in proportion to the volume of high speed rail traffic, and any obstruction of the view. 'The duty to provide special protection at crossings, such as crossing tenders, gates and automatic lights, depends upon the special dangers inherent in the situation and upon the volume of traffic on highway and railroad.' *Gillingham* v. *Railroad*, 91 N. H. 433, 437. One of the 'special dangers inherent in the situation' in this case arose from the location of the work train on the sidetrack. Another was the danger arising out of the use of the crossing by trucks constructed as was the plaintiff's. . . . Whether the defendant provided suitable protection against such risks was for the jury to determine. *Cyr* v. *Railroad*, 88 N. H. 281; *Carbone* v. *Railroad*, 89 N. H. 12; *Stocker* v. *Railroad*, 83 N. H. 401, 405; *Jones* v. *Railroad*, 83 N. H. 73, 75.

"So also was the question of whether the defendant's train was operated at a reasonable speed in view of the minimum protection afforded at the crossing. 'If, for the convenience of the public, the defendant deemed it necessary to run trains over a crossing where the view was thus obstructed, at a speed of . . . fifty miles per hour, it was for the jury to say whether ordinary prudence would not require more effective warning of the approach of trains than was furnished by the whistle and bell of

the locomotive.' *Jones* v. *Railroad*, *supra*, 76; *Collins* v. *Hustis*, *supra*, 449, 450. See also, *Huntress* v. *Railroad*, 66 N. H. 185, 191; *Davis* v. *Railroad*, 68 N. H. 247, 251. . . . The issues of speed and crossing protection were interrelated, and both were properly submitted to the jury."

The railroad excepted to the testimony of the expert called by the train passengers that the crossing was unsafe, upon two grounds. The first was that he was not qualified. It is axiomatic in this jurisdiction that the question whether a witness is qualified as an expert is within the discretion of the Presiding Justice. *Dowling* v. *Shattuck*, 91 N. H. 234. The witness Benjamin, to whose testimony the railroad objected, was a civil engineer of long experience in highway layouts, intersections and similar subjects. He gave evidence bearing on views, angles, seconds required to travel certain distances at certain speeds, safe stopping distances, and related matters. A moving body, whether it be a truck or a train, at a given speed travels a certain distance in a given time. Views which are available in the same locale from fixed points at fixed angles do not change. This witness could have been found by the Court to be more skilled and experienced in such matters as he discussed than the ordinary man. In these circumstances, it was proper for the Court to find that his testimony might aid the jury. *Walker* v. *Walker*, 106 N. H. 282.

A careful scrutiny of the record fails to reveal any abuse of the Court's discretion in permitting Benjamin to qualify as an expert, and the defendant's exception thereto is overruled. *Dowling* v. *Shattuck, supra.*

The other ground upon which exception was taken is the claim that Benjamin was allowed to testify with regard to design criteria obviously intended to provide maximum safety at intersecting ways and to provide an opinion that the tie plant crossing did not meet the standards called for by such criteria. The defendant claims the effect of this evidence was to set "ideal" standards of safety rather than those of a "reasonably prudent man." See *Fitzpatrick* v. *Company*, 101 N. H. 35, 37.

An examination of the witness' testimony does not sustain the defendant's conclusion. Benjamin gave his opinion that the crossing did not meet "standards of good practice throughout the nation and the state of New Hampshire . . . for intersections of roads and railroads at grade crossings within this state." Both in form and content, this expression of opinion, which we

believe fairly represents the essence of his testimony, complied with the long established practice here. *Calley* v. *Railroad,* 93 N. H. 359, 363. See also, *Wilson* v. *Bank,* 95 N. H. 113, 115. It is true that such standards are not the ultimate test for due care here as a matter of law. *Calley* v. *Railroad, supra,* 363; *White Mountain Power Co.* v. *Whitaker,* 106 N. H. 436. However, they were admissible on the question of the railroad's due care. *Wilson* v. *Bank, supra,* 115. The defendant's exception to Benjamin's testimony is overruled.

The railroad's contention that "the sole proximate cause of the accident" was Wrenn's negligence does not require extended consideration. There was clearly a major issue for the jury as to whether the railroad was causally negligent in operating its trains over the unprotected crossing at a speed of 70 miles an hour in view of the conditions there prevailing, not the least of which was the inadequate view afforded to an operator of an automobile proceeding toward the crossing as was Wrenn.

Nor was a nonsuit required as a matter of law because of Wrenn's contributory negligence. Although the jury by its verdict ultimately found that his conduct was such as to bar recovery against the railroad, it was for them to decide whether he was negligent in failing to hear the horn of the approaching train above the noise of the switcher whistle, and the metal tanks loaded in his truck. Similarly, it was for the jury to decide whether he should reasonably have appreciated that because of the course of the road leading to the crossing, the limitation upon his view, and the speed of the train, he could have no useful view of the tracks after the road turned abruptly toward the crossing, in sufficient time to take saving action at the speed at which he was traveling. *Jones* v. *Railroad,* 83 N. H. 73, 78. It follows that the defendant's claim that it was reversible error for the Court to refuse to grant its motion for nonsuits and directed verdicts in the case against it by Wrenn administrator cannot prevail.

The railroad also argues that the Court erred in ruling that RSA 263:78, in force at the time of the accident, was not applicable. This statute reads as follows: "Every motor vehicle used for the transportation of inflammable liquids in cargo tanks whether loaded or empty, shall, upon approaching any railroad grade crossing, be brought to a full stop not more than fifty feet and not less than ten feet from the nearest rail of such grade crossing, and shall not proceed until due caution has been taken to ascertain that the course is clear. Any person convicted of

a violation of any provision of this section, shall be fined not more than twenty-five dollars for the first offense, and not more than one hundred dollars for any subsequent offense committed during any calendar year, and for such conviction hereunder the commissioner may revoke his license to operate a motor vehicle and no new license shall be issued to such person for at least ninety days after the date of such revocation."

It is the defendant's position that the statute was plain and unambiguous and that there was no occasion for the Court to construe it. The plaintiffs say that it must be construed in the light of all the surrounding circumstances, including its history. *Colby* v. *Broderick*, 96 N. H. 316, 318. When this is done, they say it shows that the Court's ruling was correct. The dispute centers chiefly on the meaning of the words "cargo tanks" in the legislation. The defendant says this included the 100-pound cylinders containing 23 gallons of liquid propane gas which were sitting in rows in an upright position on the floor of the body of the truck, held in by tie ropes and chains across the rear to prevent the tanks sliding about on the truck floor.

Turning to the history of the legislation, it appears that within four months after the accident, the Legislature amended section 78, *supra*, as follows, in Laws 1961, 72:1.

"*Operation of Vehicles.* Amend RSA 263:78 by striking out said section and inserting in place thereof the following: 263:78. *Inflammable Liquids and Cylinders of Liquefied Petroleum Gas.* Every vehicle used for the transportation of inflammable liquids in cargo tanks, whether loaded or empty, *or for the transportation of cylinders of liquefied petroleum gas* shall, upon approaching any railroad grade crossing, be brought to a full stop not more than fifty feet and not less than fifteen feet from the nearest rail of such grade crossing, and shall not proceed until due caution has been taken to ascertain that the course is clear. . . . (Emphasis supplied).

"The term 'cylinders of liquefied petroleum gas,' as used in this section, shall not be deemed to include the following: (1) portable jugs of the nature used by tradesmen such as steamfitters, painters, plumbers, etc., or (2) bottled gas cylinders when attached to house trailers in transit. . . . "

This amendment was introduced less than one month after the accident as House Bill 15. When finally reported out by the Senate, Senator Buckley, speaking for the Senate Committee on Transportation, said: "This in effect is the same thing that we

have on gasoline; that every truck carrying explosives has to stop at railroad crossings. This *broadens* it to include petroleum gas." (Emphasis supplied). Senate Journal, April 4, 1961, *p.* 316.

It is true, as the railroad says, that words and phrases are to be construed "according to the common and approved usage of the language . . . " (RSA 21:2) and that dictionary definitions of "cargo" are "whatever is carried." Webster's New Twentieth Century Dictionary of the English Language, 2d *ed.* 1964, *p.* 339. However, witnesses from the trucking industry, who were familiar with the common and approved usage of the language in that business, never heard cylinders such as carried in the Wrenn truck referred to as "cargo tanks." On the contrary, they said the understanding in the trade is that a "cargo tank" is "a tank mounted permanently on a chassis . . . or trailer chassis." See *Dwares* v. *Clifton Yarn Mills,* 65 R. I. 471; 7 Wigmore, Evidence (3d *ed.*) *s.* 1955; 25 C.J.S., Customs and Usages, *s.* 18.

While in some cases administrative interpretations are of significance (*Bellows Falls &c. Co.* v. *State,* 94 N. H. 187) in this instance the various interpretations of section 78, *supra,* made by the several administrative officials are too conflicting and indefinite to be of real assistance. However, the expert's testimony that, in the trucking industry, the contents of the Wrenn truck would be considered cylinders and not cargo tanks, carries substantial weight.

The legislation as originally introduced in 1949 (House Bill 144) would have included all "inflammable materials," but this broad language was narrowed sharply in final passage to "inflammable liquids in cargo tanks." Laws 1949, *c.* 127, *s.* 1, RSA 263:78. In the Senate the words "liquids as a cargo" originally in the House Bill, were changed to "liquids in cargo tanks." See H. J. Feb. 10, 1949, *p.* 215 as compared to S. J. 1949, *pp.* 192, 193. This statute was in force, as previously stated, at the time of the collision.

It is obvious from this that the lawmakers understood that tanks of propane gas were not within the meaning of "cargo tanks" as used in RSA 263:78 and that they wished to broaden the new statute to include such. In the circumstances here, we believe that the change is significant.

"Because it is defined as an act that changes an existing statute, the courts have declared that the mere fact that the legislature enacts an amendment indicates that it thereby intended to change

the original act by creating a new right or withdrawing an existing one. . . . Not only is this presumption of change used in construing the provisions of the amendatory act, but it is frequently resorted to in litigation arising after the amendment to determine rights accrued under the original act. Thus, it is presumed that the provisions added by amendment were not included in the original act." 1 Sutherland, Statutory Construction, s. 1930.

The question before us is not what the Legislators ought to have done when they originally passed section 78, *supra*, or what they would have done had they thought of it. Nor is it for the Court to add terms to the statute which the Legislature did not see fit to include. *Trustees &c. Academy* v. *Exeter*, 92 N. H. 473, 478. Viewing the legislation "in its entirety" (*Colby* v. *Broderick*, 96 N. H. 316, 318), including its history and the well-established meaning of the term "cargo tanks" in the trade (see *Dwares* v. *Clifton Yarn Mills*, 65 R. I. 471), we believe that the Trial Court's interpretation of the law was correct. The defendant's exception to the ruling that RSA 263:78 was not applicable to the case is overruled.

The railroad urges that the testimony of Carl Affeldt, New England district manager of Koppers from 1945 through 1955, relating to conversations and correspondence which he had with railroad vice presidents in charge of purchases & stores, was erroneously admitted. The basis of the objection is that their declarations were neither against interest (*Rau* v. *Stores*, 97 N. H. 490), nor were they admissions. 4 Wigmore, Evidence (3d *ed.*) s. 1048. The defendant also insists that there is no evidence that either Affeldt or the railroad vice president Munster and his successor Rainie had any authority to speak for their respective companies and that therefore nothing they said were properly admissions by the company. Restatement (Second), Agency, s. 286, *p.* 6.

We believe the railroad's objections, to a degree at least, misconceive the purpose of the evidence. The testimony was admitted to show actual knowledge on the part of the railroad that the crossing was dangerous. The fact that the railroad may have been chargeable with constructive knowledge of this condition is no ground for excluding evidence of actual knowledge. *Stanton* v. *Mills*, 94 N. H. 92, 96. 2 Wigmore, Evidence (3d *ed.*) *ss.* 245, 252. The fact that the discussions had been carried on "yearly" during many years between the Koppers district

manager and the vice president of the railroad concerning "the hazardous construction of the crossing" and that the talks were initiated by the railroad, bears directly on the probable knowledge of this defendant that the crossing was dangerous. See *Smith* v. *Railroad*, 87 N. H. 246, 251. As pointed out by the plaintiff passengers, the railroad officials involved in the discussions were top level management personnel. *Cf. Nebonne* v. *Railroad*, 67 N. H. 531.

However, the Court took additional steps to protect the defendant's rights in regard to this testimony. It charged the jury that the evidence of these conversations and communications was not to be considered unless they found that the statements or correspondence came from a person who "had authority from his company or corporation to engage in conferences . . . of that type on such matters." He then gave further instructions as follows: " . . . You will, of course, weigh the testimony relative to any such conferences, negotiations and correspondence the same as you do any other testimony. If you should decide that such testimony is entitled to weight, then there is a further condition to its use. You would be entitled to take into consideration statements or correspondence by any one of these men if, but only if, you first find on all of the evidence that the man making the statement, or correspondence, had authority from his company or corporation to engage in the conferences or negotiations, or had authority to engage in conferences of that type on such matters. In deciding the question of the authority of an individual, you will consider all of the material evidence, including evidence as to his official title, or all his activities on behalf of his company so far as material, the extent of the conferences and negotiations, any action of his employer relating to the negotiations, and all of the other material evidence."

The apparent authority of a company official to engage in such negotiations as were here involved is not in issue. Restatement (Second), Agency, *s.* 286. However " . . . Evidence of what the principal has caused the agent to appear to be to third persons or as to the kind of position which the agent occupies is always admissible, however, as tending to show that the agent was in fact authorized, and if such evidence is introduced for this purpose, the question whether or not there was authority to make the statement is one for the determination of the triers of fact." Restatement (Second ), Agency, *s.* 286, *comment* ( b ).

It appeared that all negotiations between Koppers and the

railroad were handled through the latter's purchasing department, of which Munster and later Rainie were vice presidents in charge. Their duties also included the matters relative to the tenancy of Koppers, and work done by it for the railroad. The subjects discussed were the danger of the crossing and the cost of the proposed installation of flashing light warning signals. Munster recommended "many, many times" that such be installed. Because the parties could not agree as to who should pay the $4,000 cost of installation, no lights were installed.

We believe it unnecessary to detail further the lengthy testimony on this issue, as we are convinced that it was sufficient to support the submission of the question of these witnesses' authority to the jury. *Partin* v. *A. & P. Tea Co.*, 102 N. H. 62, 65; Restatement (Second), Agency, *s.* 286, *comment* (b). We find no error in the admission of this testimony upon the grounds advanced by the defendant, and its exceptions thereto are overruled.

The railroad further objected to the admission of this testimony because it fell "under the rationale, if not the letter," of the familiar doctrine which forbids evidence of repairs made subsequent to an accident. *Ware* v. *Railroad*, 92 N. H. 373; 2 Wigmore, Evidence (3d *ed.*) *s.* 283. No authority squarely in point is cited for the railroad's proposition, nor are we aware of any. Furthermore, one reason Wigmore gives for excluding evidence of post-accident repairs is that the act of making them is equivocal. It may indicate a mere belief of the owner that the object involved in the accident is capable of causing injury through another's negligence, or by pure accident, rather than that the owner himself is to blame. Another reason is that to allow such testimony might discourage owners from making improvements. On the other hand, testimony admitted against the railroad in the case before us was plainly open to the interpretation that the railroad knew before the accident that the crossing was dangerous, even for those using ordinary care. Also, no question as to making repairs after the accident was involved. *Cf. Smith* v. *Company*, 83 N. H. 439, 450. The evidence was admissible. See *Stanton* v. *Mills*, 94 N. H. 92, 96; *Smith* v. *Railroad*, 87 N. H. 246, 251.

A further question to be considered is the railroad's claim that "The court's conduct of the trial after the return of the original verdicts constituted reversible error." The case, which began on May 4, 1964, was submitted to the jury some three weeks later,

on the afternoon of May 26. During the evening of that day, the jury submitted to the Court the following written question signed by the foreman: "If negligence is found both by the *plaintiff* & the *defendant*, then who do you find for?" To this the Court replied in instructions which were correct and to which no exceptions were taken. Later in the evening, the jury sent in another written question: "Please explain the difference, if any, between *Legal Fault* & Negligence." Again the Court's reply correctly and fully stated the law, and again no one excepted. Shortly before 12 o'clock on the same night, the jury retired for the night. About 10 o'clock the following morning, the jury returned verdicts as follows:

| | |
|---|---|
| Train passengers *v.* Koppers | Verdict for Koppers |
| Truck passengers *v.* Koppers | Verdict for Koppers |
| Wrenn estate *v.* Koppers | Verdict for Koppers |
| Train passengers *v.* Wrenn estate | Verdict for passengers |
| Railroad *v.* Wrenn estate | Verdict for railroad |
| Train passengers *v.* railroad | Verdict for passengers |
| Truck passengers *v.* railroad | Verdict for railroad |
| Wrenn estate *v.* railroad | Verdict for railroad |

The Court then, subject to exceptions by all parties, submitted the following written question to the jury: "I note that in the cases of the train passengers against the Railroad you found against the Railroad, whereas in the cases of the Wrenn passenger estates against the Railroad you found in favor of the Railroad. Will you please explain the reason for this." To this the jury replied: "We found in case of the railroad passengers that the B & M was responsible for the safety of their paying passengers.

"In the case of the Wrenn passengers estate against the railroad, we found that Robert Wrenn, driver of the truck, was at legal fault." The Court then sent to the jury the following: "In the cases of the train passengers against the Railroad did you find that the Railroad was chargeable with negligence which caused or helped to cause the accident? Answer 'Yes' or 'No.'" To this the jury replied: "Yes." A further written question by the Court was: "In view of your answer to my questions, I would now like to ask you if you wish to reconsider your verdicts in any of the following cases:

| | | |
|---|---|---|
| Wrenn passengers *v.* Railroad | ___Yes | ___No |
| Railroad *v.* Robert Wrenn Estate | ___Yes | ___No" |

The jury answered "Yes" to both questions.

Thereafter they returned verdicts for the train passengers against both the railroad and the Wrenn estate, for the truck passengers against the railroad and for the defendant Wrenn estate in the case against it by the railroad. In the remaining four cases, their three verdicts in favor of Koppers, and their verdict for the defendant railroad in the case against it by the Wrenn estate remained unchanged.

The inconsistency and error in the verdicts originally returned on the morning of May 27 were immediately obvious to all parties and to the Court. It appeared that the jury had found both the railroad and the truck driver Wrenn negligent. It appeared that either they had not understood the instructions as to contributory negligence, or the rule against imputing Wrenn's negligence to his wife and minor children, the passengers in his truck.

The Court at this point could have declared a mistrial and placed on all the parties the heavy burden of the expense, the delays and the arduous labor involved in a retrial of these difficult cases in which so much was involved and which had been on trial for over three weeks. If, in fairness to everyone concerned, this course could be avoided, it was unquestionably the Court's duty to do so. "The situation appears to have been that the jury had misconceived its duty, and needed to be instructed therein. In such a situation it is not only the right *but the imperative duty* of the Presiding Justice to explain to the jury how they should proceed and to direct them to give the case further consideration." *State* v. *Shaheen*, 81 N. H. 194, 196. (Emphasis supplied). This has been the law here from early times. *Walker* v. *Sawyer*, 13 N. II. 191, 196. It has been reaffirmed often and it continues to be our rule. *Eichel* v. *Payeur*, 106 N. H. 484.

The railroad does not dispute this, but urges that the questions put by the Court were in effect an attempt to "coerce or compel the jury to agree" upon certain verdicts. The defendant states that when the jury returned the verdicts originally and were asked how they reached two of them, they must have known that there was something wrong with these two. This, of course, is so, and indeed it was the proper purpose of the Court's question to bring this fact home to the jury. We see no error in this procedure.

The defendant's next proposition is that the jury must have found the railroad free from legal fault as evinced by the verdict

for the railroad as plaintiff in its case against the Wrenn estate. This presents only half of the picture, and we do not think that the railroad's conclusion follows. Rather, by their verdicts for the train passengers against both the railroad and the Wrenn estate, it appears that they found both of them to blame for the accident, or in other words, the jury thought both were guilty of legal fault. In view of this situation, the Court's question asking the jury to explain how they found against the railroad in the train passengers' cases against it and for the railroad in the case against it by the truck passengers, was a proper and neutral question which did not favor either party. To this question the jury's reply, while not couched in consistent legal phraseology, showed that they found that both the railroad and Wrenn were legally responsible. The Court had charged that the railroad was "a common carrier of passengers for hire" and that although it did not insure its passengers, it had to use the ordinary care "of one in its position." This appears to account for the jury's language that they found that the "B & M was responsible for the safety of their paying passengers."

The probable over-all explanation of the inconsistency is that in this long and involved trial, which necessitated a charge of substantial length, including legal language, and required that the jury be given numerous blank verdicts to fill out, they became confused in making out the verdicts. Also, as pointed out by counsel during the discussions in chambers relative to this portion of the proceedings, the jury had not been specifically instructed that the fault of Robert Wrenn could not be imputed to his wife and children. This, too, may have contributed to the difficulty.

However, the Court's question, whether they found the railroad "chargeable with negligence which caused or helped to cause the accident," with a direction that the question be answered "Yes" or "No", is fair and unmistakably plain. The jury's answer "Yes" left no doubt as to where they stood and that they believed that the railroad by its negligence caused or helped to cause the accident.

That they should reconsider their verdicts in the case of Wrenn passengers v. railroad and the railroad v. the Wrenn estate was then apparent. Nevertheless, the Court did not order them to do so, but asked them if they wished to reconsider their actions in these cases. Their replies were an unequivocal "Yes", and upon such reconsideration, consistent verdicts were returned.

In summary, considering the whole course of the trial, neither in the procedure adopted by the Court nor in the form and substance of the questions asked do we discover any prejudice to the rights of the defendant railroad or any other party. The Court's finding that the trial was fair is sustainable, and the railroad's and all other exceptions on this phase of the cases are overruled. *Walker* v. *Walker*, 106 N. H. 282; *McLaughlin* v. *Union-Leader*, 99 N. H. 492, 499.

There remains to be considered the railroad's exception to the Court's failure to "grant its requests numbered one through forty-four except as covered either directly or in form. . . . " While it is evident that this method of excepting to a charge where many and lengthy requests are involved is not calculated to focus the Court's attention on specific errors, it has been held to be sufficient. *Lynch* v. *Sprague*, 95 N. H. 485, 490; *Peppin* v. *Railroad*, 86 N. H. 395, 401. However, a careful examination of the requests in connection with the charge discloses no error. It was not necessary that the Court employ the specific language of the requests, nor that it emphasize selected portions of the evidence. *Lynch* v. *Sprague*, *supra*; *Tremblay* v. *Donnelly*, 103 N. H. 498, 504. We believe this covers the railroad's exceptions.

In the cases involving the Robert Wrenn estate, exceptions were taken by the administrator to the refusal to grant his requests numbers 2, 20 and 21. An examination of the charge discloses that these requests were covered in substance insofar as applicable, and it was not necessary for the Court to use the precise language suggested by counsel for Robert Wrenn. *Gosselin* v. *Lemay*, 85 N. H. 13. It follows that exceptions to the Court's failure to grant these requests are unavailing.

Since an examination of the entire record discloses no error in the trial, the order is

*Exceptions overruled; remanded.*

All concurred.