Rockingham,
No. 5312.

HAMPTON *& a.*

*v.*

HAMPTON BEACH IMPROVEMENT COMPANY, INC. *& a.*

Argued November 2, 1965.
Decided March 30, 1966.

*Cooper, Hall & Walker* and *Upton, Sanders & Upton* ( *Mr. Robert W. Upton* orally ), for the plaintiffs.

*McLane, Carleton, Graf, Greene & Brown* and *Robert A. Raulerson* ( *Mr. Raulerson* orally ), for the defendants.

LAMPRON, J. The first three transferred questions pertain to the effect on the lease of the dissolution as a corporation of the lessee Hampton Beach Improvement Company.

This lease had its origin at a town meeting held in Hampton on April 24, 1897 for, among other purposes, "to see if the Town will pass any vote or votes relative to the leasing of any or the whole of the lower or Pines Marsh Beach to . . . parties who will open and improve the same for building purposes on some reasonable terms." These premises "were a narrow strip of undeveloped land consisting of barren sand dunes and marsh land. This land lay between the Atlantic Ocean on the East and large areas of salt marsh on the West." The following vote was adopted at that meeting. "Whereas the land owned by the town extending from the Island Path to the river mouth not being utilized and will not be for any town purpose nor yield any income to the town and whereas said land being so well located and so convenient for cottage purposes under the new system street railway travel it is capable of yielding a large income to the town and greatly increase its taxable property and whereas there are responsible parties ready and willing to lease and improve the same for the town's interest - - therefore resolve that the selectmen

be instructed to lease the same to the Hampton Beach Improvement Company at such rental and under such conditions as will be for the best interest of the town and for the most valuable improvement of said land."

As stated in the preamble to the lease, the company, which became the lessee, "submitted to the selectmen . . . its proposition . . . which is the same set forth and contained in the lease . . . which . . . seems to the selectmen to be for the best interest of the town and the most valuable improvement of said land." By its terms, this lease for 99 years executed April 1, 1898, almost one year after the vote authorizing it, obligated the company to pay an annual rental of $500; to construct and keep in repair at its own cost and expense cross streets between roads constructed by the town; to prohibit the sale of intoxicating liquors on the leased premises; to restrict the type of buildings to be erected on the street facing the ocean; and to "use its best efforts to lease lots of land from the leased premises and have cottages and dwelling houses erected thereon and bring taxable property into the town and improve said leased premises for the best interests of the town and will endeavor to have and maintain an orderly and respectable place there which shall be for the benefit and credit of said town." The lessor agreed to build and maintain a highway east of the leased premises. Without affecting its right to tax all buildings erected on the land, the town agreed not to tax the leased land or if taxed to pay said tax or if paid by the lessee it was to be deducted from the annual rent.

The following facts are agreed on by the parties. The company has constructed, maintained, and repaired at its own expense, fifteen cross streets between Ocean Boulevard, a highway constructed by the town east of the leased premises, and Marsh Avenue (now Ashworth Avenue) another highway constructed by the town west of the leased land. The company has entered into subleases with the result that "large, permanent and expensive improvements have been made and buildings erected so that at the present time, all of the land presently occupied by the company contains residential, commercial and other types of buildings. Since 1898, the company has expended substantial sums of money in developing the leased area, promoting the leasing of lots therein and the erection of buildings thereon, and the building and repairing of streets and sidewalks."

The parties are also in agreement on the following facts. During the early years, the company had little, if any, profit from operations under the lease, but the profits since have greatly increased as has the value of the land under lease. "In the year 1898 the company had a net loss of $550.50 and in 1914 a loss of $1,950.99. Its net profits after taxes were $1,973.17, $4,654.12, $6,504.16, $10,680.34 and $17,129.25 for the years 1924, 1944, 1954, 1956 and 1962 respectively." "The fair market value of the land under lease, exclusive of additions and improvements made since the execution of the lease in 1898, is now not less than $300,000," while the leased premises occupy "less than two percent of the total area of the town" the assessed value of the property thereon represented $2,331,025 of the town's total valuation of $20,062,859 in the year 1962.

The lessee Hampton Beach Improvement Company was founded in 1897 as a voluntary corporation under the provisions of chapter 147 of the Public Statutes which, with specified exceptions, authorized such corporations to carry on "any lawful business." P. S., c. 147 s. 1, x. By virtue of Laws, 1919, c. 92 authorizing and regulating business corporations, this company could have voted to come within its provisions thereby obligating this company to make an annual return to the Secretary of State and to pay an annual fee. Ss. 36, 38. There is nothing in the record indicating that such a vote was ever taken by it.

Laws 1933 chapter 318 "repealed, revoked and annulled" the charters of "any corporation organized for profit before March 28, 1919 which had not made an annual return or paid a fee to the Secretary of State" with certain exceptions not material here. However under its section 3 "any such corporation may reinstate itself as a corporation within two years after the date that this act takes effect" by making formal application for reinstatement and by the payment of fees, if any, in arrears, "and the filing of annual returns required by law since January 1, 1926." The parties agree that the "company did not apply for reinstatement, possibly because not formally notified of the annulment of its charter. In ignorance of its dissolution the officers and stockholders of the company collected rents, executed subleases and in general exercised the rights and privileges of the company, as lessee, as though its charter had not been revoked and annulled and did not learn that the charter had been annulled

until the filing of this petition for declaratory judgment in 1955. The town did not learn of the repeal and annulment of the charter until informed by its counsel shortly before the petition was filed."

March 29, 1956 the intervenor, Hampton Beach Improvement Company, Inc. was organized as a business corporation in this state. Article 2 of its articles of agreement states in part as follows: "The objects for which the Corporation is established and the nature of the business to be transacted by it are as follows: To re-establish the corporate status of the Hampton Beach Improvement Company, a corporation duly organized under Chapter 147 of the Public Statutes of the State of New Hampshire in September, 1897 . . . . It is the desire, intention and purpose of the incorporators to re-establish the corporate identity of the aforesaid company and to have the new corporation carry on the same business and have the same purposes as the aforesaid company prior to its dissolution by statute."

It is agreed that "the individual defendants are or were the stockholders of the dissolved corporation, who claim to have succeeded to its rights as lessee under the lease." It is further agreed that as such sole stockholders they transferred "all their right, title and interest in and to the business, assets, rights, contracts, and any and all other property heretofore owned by the dissolved corporation to the Hampton Beach Improvement Company, Inc. in exchange for its capital stock." This latter corporation issued 40 shares of its stock in the same amounts and to the same stockholders who held stock in the old corporation at the time of its dissolution. These persons were members of the families of three of the original five persons to whom 40 shares of stock in the original corporation were issued.

I. The first three transferred questions read as follows:

"I.    Did the revocation of the charter and dissolution of the Hampton Beach Improvement Company by Laws of 1933, Chapter 318, and the failure of the company to reinstate itself as therein provided terminate the lease?

"II.    If the dissolution of the Improvement Company did not terminate the lease, did its stockholders upon dissolution succeed to the lease and the rights and privileges of the Improvement Company under the lease?

"III.    Do the peculiar terms of the lease defining the relation between the town as lessor and the Improvement Company as

lessee create a relation of trust and confidence which precludes the assignment or transfer of the lease to a successor or assignee without the consent of the town?"

Setting aside question III for the present we advert to the first two questions. Laws 1933, chapter 319, by which the company's charter was revoked, provided in its section 4 that such a corporation shall "continue as a body corporate for the term of three years . . . for the purpose of . . . distributing its assets, including the disposition and transfer of all or any part of its property." This evidences a repudiation of the early common law rule "if it ever really was a rule" that all real estate held by a corporation at the time of its dissolution reverted to its grantors and all of its personal property vested in the sovereign for want of any other owner. 16A Fletcher, Corporations ( Perm. *ed.* ) *s.* 8134, *pp.* 295, 296; 19 Am. Jur. 2d, Corporations, *s.* 1657, *pp.* 1005, 1006. See *Addy* v. *Short,* 47 Del. 157; RSA 294:98.

We subscribe to the general rule that after the dissolution of a corporation its property passes to its stockholders subject to the payment of the corporate debts. *DiPrete* v. *Vallone,* 72 R. I. 137; *Brooks* v. *Saloy,* 334 Ill. App. 93, 99; *Cummington Realty Associates* v. *Whitten,* 239 Mass. 313, 325; 19 Am. Jur. 2d., Corporations, *s.* 1659, *p.* 1007. There being no specific provision in this lease for its termination on the dissolution of the lessee company, we hold that unless prevented by the principles contained in question III, to be hereinafter considered, the stockholders succeeded to the lease and to the rights and liabilities of the company in the leasehold estate. *Cummington Realty Associates* v. *Whitten, supra;* 16 A Fletcher, Corporations, ( Perm. *ed.* ) *s.* 8124, *p.* 279; 19 Am. Jur. 2d, Corporations, *s.* 1660, *p.* 1008. See *Conn* v. *Company,* 79 N. H. 450, 451; Annot. 147 A.L.R. 360, 362.

The answer to question I is "no" and the answer to question II is "yes." The lease did not terminate with the dissolution of the lessee company and the stockholders succeeded to the company's rights and privileges under the lease.

Turning now to question III, in the absence of a restriction on the right of assignment fixed by the parties themselves, a tenant under a lease for a definite term has, as an incident to his estate, the right to assign his leasehold interest in the demised premises without the consent of the lessor. *Voudomas* v. *Bragg,*

83 N. H. 270, 273. It is also true, as contended by the plaintiff, that "when rights arising out of a contract are coupled with obligations to be performed by the contractor and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned." 4 Corbin, Contracts, *s.* 865; *Bethlehem* v. *Annis,* 40 N. H. 34, 41; *Tough* v. *Netsch,* 83 N. H. 374, 378; *Wetherell Bros. Co.* v. *United States Steel Co.,* 200 F. 2d 761, 763 ( 1st Cir. 1952 ); *Smith, Bell & Hauck* v. *Cullins,* 123 Vt. 96; *Perthou* v. *Stewart,* 243 F. Supp. 655 ( D. Ore. 1965 ). In such a situation the rights under a lease would not pass to the stockholders of the corporate lessee on dissolution even though they would carry on the business substantially in the same way in which it was carried on previously. 3 Williston, Contracts ( Jaeger 3d *ed.* ) *s.* 411A, *p.* 26.

The answer to question III must be found in the intent of the parties as revealed by the terms of the lease, the relation of the parties, the subject matter of the contract and all other surrounding circumstances. *Perry* v. *Company,* 99 N. H. 451, 453.

By its terms this ninety-nine-year lease was to the "lessee, its successors and assigns." They were to hold and enjoy the premises free from lawful eviction. All other covenants of the lessor ran to the "lessee, its successors and assigns." The "lessee, its successors and assigns" agreed to "use its best efforts to lease lots of land . . . and bring taxable property into the town." The "lessee, its successors and assigns" could be expelled by the town for failure to pay rent or observe other covenants in the lease. The use of the word "assigns" is not necessary to make a lease assignable. 1 Tiffany, Real Property ( 3d *ed.* 1939 ), *s.* 118, *pp.* 183, 184. However while the absence of words of assignability, such as successors or assigns, is not of itself controlling, it is some evidence that intention of the parties was against assignment. *Smith, Bell & Hauck* v. *Cullins,* 123 Vt. 96, 101. By the same token the use of such words in a lease, as is the case here, must be considered as some evidence that the parties intended it to be assignable. *North Hampton District* v. *Society,* 97 N. H. 219, 220.

The plaintiff makes the following argument in its brief in support of its contention that the lease, and the obligations and duties of the company are neither assignable nor delegable. "The

development of the leased premises required judgment, sales-manship and administrative ability which the lessee undertook to provide. The trust and confidence of the town of Hampton in the Hampton Beach Improvement Company is reflected in the terms of the lease which committed the development and improvement of the leased premises to the Improvement Company for a term of 99 years."

The long term of the lease is an ambivalent factor. If it reflected the confidence of the town in the five persons who originally constituted the company, it must have brought to mind also the fact that these five persons were not likely to live out its term and would normally be replaced by "successors and assigns." Furthermore "if a principal contracts with a corporation, he contemplates a changing personnel" especially where, as in this case, there is no evidence that the original stockholders could not sell their interests at anytime to anyone. *Knudsen* v. *Torrington Company,* 254 F. 2d 283, 287 ( 2d Cir. 1958 ).

Nor can it be effectively argued that the town was relying heavily on the experience, credit and financial resources of Hampton Beach Improvement Company. *Paige* v. *Faure,* 229 N. Y. 114. As a matter of fact the company was only seven months old at the time of the agreement with a paid up capital of $1,000. It is agreed that the stockholders of the new corporation are the sole stockholders of the dissolved original lessee corporation. A majority of them "reside in Hampton and are members of the families of the original stockholders of the dissolved corporation." All stockholders of the dissolved corporation transferred "all their right, title and interest in and to the business, assets, rights, contracts, and any and all other property heretofore owned by the dissolved corporation to the Hampton Beach Improvement Company, Inc., in exchange for its capital stock."

In view of the language of the lease; its term of 99 years; the relatively short corporate existence and the not too impressive financial resources of the lessee when the lease was executed; the fact that the individuals who now have succeeded the original lessee most likely would have succeeded to the rights of the original corporation if its charter had not been revoked, we conclude that Hampton Beach Improvement Company, Inc. and its stockholders as the lessees are not such a change from the original lessee as to be beyond the contemplation of the town in executing

the lease. *Knudsen* v. *Torrington Company,* 254 F. 2d 283, 287 (2d Cir. 1958). Nor can we see how the changes in the legal status of those who have continued in the performance of the covenants of the original lease have materially affected the agreement of the parties to the lease. *Des Moines Blue Ribbon Distrib.* v. *Drewrys Ltd.,* 129 N. W. 2d 731 (Iowa 1964).

We hold that the lessee's rights under this lease have been transferred from the Hampton Beach Improvement Company to its stockholders and by them to Hampton Beach Improvement Company, Inc. The answer to transferred question III is "no."

II. The remaining questions relate mainly to the validity of the following covenants in this lease. "And the said lessor covenants and agrees with the said lessee, its successors and assigns, that it will not tax said lands or any part thereof during the term of this lease, or if it does tax the same or any part of it, the amount of said tax shall be paid by said lessor, or if paid by said lessee, its successors and assigns, shall be deducted from the annual rent." These questions are as follows:

"IV. In view of the changes which have occurred since the execution of the lease as of April 1, 1898, and in particular the increased value of the leased premises, are the covenants relative to taxation and rent [$500 annually] now valid and binding upon the Town?

"V. [Are the above covenants about taxes] . . . invalid as an *ultra vires* and unconstitutional grant by the Town to the Hampton Beach Improvement Company, its successors and assigns, of a special exemption of the leased premises from taxation?

"VI. [Are the same covenants] . . . unconstitutional and invalid because in conflict with and repugnant to the constitutional rules of uniformity and equality governing the assessment and collection of property taxes in that they would exempt the lessee, its successors and assigns, from the payment of taxes on the leased premises and increase the burden of other taxpayers?

"VII. [Are the same covenants] . . . repugnant to, and in violation of the provisions of the Constitution of New Hampshire, and in particular Part I, Art. 12 and Part II, Art. 5, as a grant or donation by the Town to a private corporation?"

Certain aspects of these covenants and some of the above questions relating thereto were considered by this court in *Hampton &c. Co.* v. *Hampton,* 77 N. H. 373.

The plaintiff has stated in its brief that "the sole purpose of the town in entering into the lease was the development and improvement of the large tract of undeveloped land at Hampton Beach suitable for residential and related uses." To accomplish this end it was provided in the lease that the company was to "use its best efforts to lease lots of land from the leased premises and have cottages and dwelling houses erected thereon and bring taxable property into the town and improve said leased premises for the best interests of the town" and "to have and maintain an orderly and respectable place there which shall be for the benefit of and credit to said town."

Under this lease the land which the town meeting of April 24, 1897 said was "not being utilized and will not be for any town purpose nor yield any income to the town" was divided by the lessee into blocks containing approximately 320 lots each of which, with few exceptions, contained approximately 5,000 square feet. These blocks were separated by fifteen cross streets constructed and thereafter maintained and repaired by the lessee at its expense. All of the land leased to the company now contains residential, commercial and other types of buildings which had a total assessed value in 1962 of $2,331,025 and the leased land has a value of not less than $300,000. It would be pure speculation to try to estimate what these values would be but for the lease. In 1962 the taxes received by the town on account of improvements made in the leased area, which is less than 2% of the total area of the town, exceeded $151,500 or approximately 10% of the town's total tax income. To say whether or not the selectmen of the town in 1898 would have entered into this agreement, or any lease, if they had been endowed with the faculty of then discerning the conditions which now exist would constitute conjecture. If by hindsight it is arguable that the lease has proved to be less advantageous to the town than the selectmen anticipated when it was given, this fact would furnish no basis in and of itself to declare the lease or any of its covenants null and void. *Bourn* v. *Duff,* 96 N. H. 194, 198; *Fuller Enterprises* v. *Manchester Sav. Bank,* 102 N. H. 117, 122. The answer to question IV is "yes."

The tax covenants in question viewed in the context of the lease as a whole, were intended, along with the covenant for rent, to establish a fixed price to be paid by the company to the town for the use of this land. No provision was made for

an increase in the annual rent of $500 if during the ninety-nine-year term of this lease this land should become more valuable as it is reasonable to assume both parties to the agreement expected it would. The same purpose prompted the agreement with respect to taxes. In order that the lessee would not be faced with increased yearly expenses if this land became taxed during that period, the town as part of the agreement undertook to pay such taxes. We see no reason to make a distinction in this respect between a tax imposed on the town as the owner or on the lessee as having an interest therein which was being created by the very lease entered into by the parties.

We agree today with what this court said in *Hampton &c. Co.* v. *Hampton,* 77 N. H. 373, 374 that this does not constitute an exemption in the nature of a gratuity but a matter of contract between the town as owner of the land and the lessee who was to serve as the means of developing it for the benefit of Hampton. *Piper* v. *Meredith,* 83 N. H. 107, 113. The town could not lawfully exempt the real estate from taxation but could validly contract with the lessee to pay any taxes as a consideration for the lessee's undertakings in the lease. We further hold that this agreement was within the power of the town and the authority of those acting for it. When town property is not required for public use, the town "is not compelled to let the property lie idle." *Davis* v. *Rockport,* 213 Mass. 279, 283; 10 McQuillin, Municipal Corporations ( 3d *ed.* ) *s.* 28.42, *p.* 99. The town of Hampton could properly put its undeveloped property to reasonable use, by lease or otherwise ( *Sherburne* v. *Portsmouth,* 72 N. H. 539; *Piper* v. *Meredith, supra; Meredith* v. *Fullerton,* 83 N. H. 124 ) and meet the expenses incidental to its contract with the lessee. *Curtis* v. *Portsmouth,* 67 N. H. 506. See also, *Amoskeag Industries* v. *Manchester,* 93 N. H. 335; *deRochemont* v. *Holden,* 99 N. H. 80, 82. The answer to question V is "no."

These covenants to save the lessee harmless from the governmental burdens of taxation were part of an agreement entered into between the town and the lessee to advance the interests of Hampton. The costs resulting to the town on account of these covenants constitute an expense of the town in carrying out its functions. They do not differ in legal effect from a payment made by the town to a contractor for services rendered to the town in the execution of its ordinary affairs. We fail to see how these covenants violate the constitutional rules of uniformity and

equality governing the assessment and collection of property taxes. *Monadnock School District* v. *Fitzwilliam,* 105 N. H. 487, 495, 496. See *Curry* v. *United States,* 314 U. S. 14, 18. The answer to question VI is "no."

In the performance of its obligations under this lease it is agreed that "since 1898, the company has expended substantial sums of money in developing the leased area, promoting the leasing of lots therein and the erection of buildings thereon and the building and repairing of streets and sidewalks." As previously stated herein, in 1962 the total assessed value of property in the leased area was $2,331,025. "The company [has] through its subleases and renewals . . . continually prohibited the sale of intoxicating liquors or the maintenance of a nuisance or disorderly houses on the premises and has used its best efforts to lease by lots all of the premises and cause the construction and erection of buildings and residences thereon. All of these efforts of the company have resulted in an orderly and respectable place or area which has been a benefit and a credit to the town of Hampton." During the early years of the lease the company had little, if any, profit from its operations. It had a net loss of $550.50 in 1898 and a net loss of $1,950.99 in 1914. Its net profit before taxes in 1924 was $2,025.80; in 1934, $2,273.41; in 1944, $5,986.25; in 1954, $9,384.30; in 1956, $15,140.02; and in 1962, $24,470.36. However our Constitution does not require that all parties to public contracts must operate at a loss. The test to be applied is whether the lease over its entire term will be primarily of benefit to private parties or whether it will serve mainly proper public purposes with incidental benefits to private parties. *Opinion of the Justices,* 99 N. H. 528, 530. We hold that the entire undertaking in its operation and results primarily was intended to and does serve the public interests of the town of Hampton although by its nature private parties will receive certain benefits from it. Consequently the expenditures or lack of revenue by the town which result therefrom are in the promotion of the general welfare of the town and are proper. *Conway* v. *Water Resources Board,* 89 N. H. 346, 350; *Opinion of the Justices,* 106 N. H. 237, 240. The answer to question VII is "no."

*Remanded.*

All concurred.