Hillsborough,
No. 6047.

### CLUB JOLLIET, INC.

*v.*

### MANCHESTER & a.

March 12, 1970.

*Gerard O. Bergevin* and *Emile R. Bussiere* ( *Mr. Bussiere* orally ), for the plaintiff.

*J. Francis Roche,* City Solicitor ( by brief and orally ), for the defendant city of Manchester.

*Broderick, Craig & Costakis* and *Vincent A. Wenners, Jr.* ( *Mr. William H. Craig* orally ), for the defendant Manchester Housing Authority.

*Devine, Millimet, McDonough, Stahl & Branch* ( *Mr. Joseph A. Millimet* orally ), for the intervenors, Spaulding and Slye Corporation and New England Mutual Life Insurance Company, a joint venture known as the Hampshire Plaza Development Company ( the developer ).

KENISON, C. J. The plaintiff is a voluntary corporation, property owner and taxpayer which seeks to enjoin and appeal from the actions of the Mayor and Board of Aldermen of the city of Manchester, and the Manchester Housing Authority, in instituting a redevelopment project known as the Hampshire Plaza Project.

The standards and controls of the redevelopment plan are carefully and specifically detailed in the contracts, resolutions, votes, maps, plans, and regulations adopted and executed by the defendants, city of Manchester ( City ) and Manchester Housing Authority ( Authority ) and the developer. The essential facts are not in dispute. In its barest outline the redevelopment plan provides that the Authority would acquire by purchase or eminent domain a two-block area in downtown Manchester, demolish the buildings thereon, close certain streets, and add certain improvements including a public parking garage for 400 automobiles.

The redevelopment plan requires the developer to provide a landscaped plaza fronting on a major street, a public shopping mall with retail area, a multi-storied office building, an underground parking garage for 300 automobiles, and other improvements. The redevelopment project is not financed by federal funds. It involves a bond issue by the city of $5,230,000 which will pay for the property to be taken by eminent domain and attendant costs, as well as approximately $1,500,000 for the construction of the public parking garage. The rentals from the public parking garage will accrue to the city. The redevelopment plan contemplates that after clearance of the property the land will be transferred to the developer at its use value which will be less than the total acquisition cost.

The case was transferred by a Judicial Referee ( *Amos N. Blandin, Jr.* ) whose findings and rulings included the following:

" 6. The procedure followed by the Manchester Housing Authority and the Board of Mayor and Aldermen in adopting and approving the redevelopment project known as Hampshire Plaza was in accord with the standards and criteria established by RSA:205 and followed the practice established by the Authority and the City in prior projects in Manchester which were not federally funded. There was no violation of Part 1, Article 2 and Part 2, Article 5 of the New Hampshire Constitution.

" 7. The condemnation of private property and the transfer of said property for development purposes at a price less than its pre-existing market value was authorized pursuant to a duly qualified redevelopment project under state law at a price fixed by two independent re-use appraisers retained by the Manchester Housing Authority and was, therefore, not a transfer at a price arbitrarily negotiated with the private developer nor in violation of Part 2, Article 5 of the New Hampshire Constitution.

" 8. In declaring the area bounded by Spring, Elm, Mechanic, and Canal Streets as blighted, decadent and substandard the Manchester Housing Authority and the City have followed the standards of RSA:205 and have not acted arbitrarily, capriciously, confiscatorily, or in collusion with a private developer.

" 9. Subject to the question being transferred concerning the applicability of RSA:252-A to the Hampshire Plaza Project, the resolution of the City of Manchester dated November 18, 1969, authorizing a bond issue in the amount of $5,230,000 for a locally financed redevelopment project is in accord with the applicable state statute ( RSA:205 ) and is not unconstitutional. "

The two questions of law on which no ruling was made were:

"A. Can the Manchester Housing Authority build a public parking garage as part of a Redevelopment Project such as Hampshire Plaza under the powers conferred on it by RSA 205?

"B. Can the City of Manchester provide public funds to the Manchester Housing Authority for such a garage as part of a Redevelopment Project under RSA 205 without complying with the provisions of RSA 252-A (Supp.)?"

The Court (*Grant*, J.) transferred without ruling questions A and B, and included "within the issues transferred the question of whether Part 2 Article 5 of the New Hampshire Constitution is violated by the construction of a public parking garage such as the one described in the Redevelopment Plan for Hampshire Plaza."

In 1954 *Velishka* v. *Nashua*, 99 N. H. 161, 106 A.2d 571 made clear two propositions: (1) that a redevelopment project constitutes ". . . a valid public purpose for which public funds may be appropriated and the power of eminent domain granted," (*p.* 165), and (2) that the sale or lease of land "at its use value" which is below the cost to the city is not a grant of public funds for private purposes forbidden by our Constitution, Part II, Art. 5, (*p.* 168). There were then only two states that held a contrary view. Annot. 44 A. L. R. 2d 1414. *See Housing Authority of Atlanta* v. *Johnson*, 209 Ga. 560, 74 S. E. 2d 891; *Adams* v. *Housing Authority of Daytona* (Fla.) 60 So. (2d) 663. The Georgia decision has been nullified by a constitutional amendment. Mandelker, Managing Our Urban Environment, 581 (1966). The Florida decision has been virtually overruled in subsequent cases. By the great weight of authority in this state and elsewhere the alleviation of traffic congestion by providing for off-street public parking facilities is a valid public purpose which can be accomplished by a redevelopment project. *Opinion of the Justices*, 109 N. H. 396, 254 A.2d 273; *Stott* v. *Manchester*, 109 N. H. 59, 242 A.2d 58; *Seligsohn* v. *Philadelphia Parking Authority*, 412 Pa. 372, 194 A.2d 606.

"The parking problem is an ancient one. The right of the state to deal with parking in the streets, as an adjunct of the right to control traffic on the streets, is as old as the problem." Magnusson, Parking Facilities: Some Legal and Financial Considerations, 46 Va. L. Rev. 595 (1960); *Opinion of the Justices*, 94 N. H. 501, 51 A.2d 836. The mode and means of regulating the flow of traffic has changed over the years but the power of the municipality to deal with it in some reasonably effective way has been

consistently upheld. From the hitching posts and stepping stones of another day ( 10 McQuillin, Municipal Corporations ( Rev. Vol. 1966 ) *s.* 30.104 ), to the curb, then to street parking, metered and unmetered ( RSA 249:1, 2 ) were normal progressive changes which municipal law legalized and enforced. More recently off-street parking, horizontal, underground, and multi-storied has proved to be a necessary adjunct of attacking the traffic congestion problem. *Opinion of the Justices,* 109 N. H. 396, 254 A.2d 273.

The concept of a public purpose generally, and specifically as it relates to parking facilities, is neither static nor stationary. *Conway* v. *Water Resources Board,* 89 N. H. 346, 349, 199 A. 83, 87; *City of Trenton* v. *Lenzner,* 16 N. J. 465, 109 A.2d 409; *State, on inf. of Dalton* v. *Land Clearance for Redevelopment Authority of Kansas City,* 364 Mo. 974, 270 S.W.2d 44; 7 McQuillin, Municipal Corporations ( 1968 Rev. Vol. ) *s.* 24.563c. What constituted a public purpose in 1870 does not necessarily set the outer limits of that public purpose in 1970. The same thought was expressed by a respected source some years ago in *Green* v. *Frazier,* 253 U. S. 233, 242, 64 L. Ed. 878, 883, 40 S. Ct. 499, 502-503: "In many instances States and municipalities have in late years seen fit to enter upon projects to promote the public welfare which in the past have been considered entirely within the domain of private interprise." *See* 1 Antieau, Municipal Corporation Law, *s.* 8.16 ( 1966 ).

The entire redevelopment project has been determined to serve a public purpose. Since the public parking garage is essential to the overall project the project is not invalidated because private interests may derive incidental benefits. *Opinion of the Justices,* 106 N. H. 237, 240, 209 A.2d 474, 476; *Conway* v. *Water Resources Board,* 89 N. H. 346, 199 A. 83, *supra.*

Basic to a proper consideration of the issues raised in this case is the statement of the unanimous court in *Berman* v. *Parker,* 348 U. S. 26, 33, 99 L.Ed. 27, 38, 75 S.Ct. 98, 102-103: "The concept of the public welfare is broad and inclusive . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." Implicit in that statement is the proposition that a community as part of a redevelopment project may take the necessary steps to

determine that traffic congestion may be alleviated if not eliminated.

In view of the foregoing we conclude that a public parking garage serves a public purpose and that the construction of a public parking garage as described in the Redevelopment Plan for Hampshire Plaza in this case is not a violation of Part II, Art. 5th of the New Hampshire Constitution. *Opinion of the Justices,* 94 N. H. 515, 517, 53 A.2d 194, 195; *Hampton* v. *Hampton Beach Improvement Co.,* 107 N. H. 89, 218 A.2d 442. Note, Urban Renewal: Problems of Eliminating and Preventing Urban Deterioration, 72 Harv. L. Rev. 504 ( 1959 ); Scheuer, Goldston and Sogg, Disposition of Urban Renewal Land - A Fundamental Problem in the Rebuilding of our Cities, 62 Colum. L. Rev. 959, 988 - 991 ( 1962 ).

We now consider the following question: " A. Can the Manchester Housing Authority build a public parking garage as part of a Redevelopment Project such as Hampshire Plaza under the powers conferred on it by RSA 205?" For reasons hereinafter indicated our answer is, yes. At the outset, in the interests of clarity, we start with the candid observation that RSA ch. 205 authorizing redevelopment projects contains no express words relating to public parking garages. Hence, the underlying question is whether the language of the statute includes within its terms grants of authority broad enough to include the construction of a public parking garage. RSA 205:2 ( 4 ) permits any housing authority established pursuant to RSA ch. 203 to carry out a redevelopment project by installing, constructing, reconstructing streets, utilities and " site improvements. " RSA 205:2-a provides the housing authority may construct or reconstruct streets, utilities, parks, playgrounds, " and other improvements. " *See also* RSA 205: 4 ( 1 ) where reference is made to " objectives as to . . . improved traffic, public transportation . . . and other public improvements. " We entertain no doubt that the language of RSA ch. 205 was intended to and does include the power to construct a public parking garage. *Wayne Vil. President* v. *Vil. Clerk,* 323 Mich. 592, 36 N. W. 2d 157; *City of Trenton* v. *Lenzner,* 16 N. J. 465, 109 A. 2d 409.

The final question transferred without ruling, reads as follows: " B. Can the City of Manchester provide public funds to the Manchester Housing Authority for such a garage as part of a Redevelopment Project under RSA 205 without complying with the provisions of RSA 252-A ( Supp. )?" Our answer is, yes. RSA ch. 252-A ( supp ), Laws 1969, 493:1 sets out a method

for the city of Manchester ( RSA 252-A:1, III ) to acquire and construct off-street parking facilities. Admittedly the defendants have proceeded under RSA ch. 205 and have not utilized the new law and have not attempted to proceed under its provisions. The new law provides for a new and different method of financing public parking facilities and by amendment of RSA ch. 203 permits construction of such facilities by a housing authority without regard to whether the area is blighted or a slum area. RSA 203: 8, IX ( supp ); RSA 203:23, XV ( supp ). The plaintiff contends that these provisions are mandatory and exclusive. While this contention is an arguable one, it overlooks the broad authority conferred by RSA ch. 205 and the strong policy in this state against the implied repeal of statutes. *Opinion of the Justices,* 107 N. H. 325, 328, 221 A.2d 255, 257; *Hayes* v. *Archambault,* 106 N. H. 434, 436, 213 A.2d 422, 424; *O'Brien* v. *Manchester,* 84 N. H. 492, 152 A. 720. Existing powers of municipalities traditionally have not been abolished or restricted unless there was an express statutory provision to that effect or unless it was clear from the language that that was the unmistakable intent of the legislature.

In the present case the legislative history of the statute ( RSA 252-A ( supp ) ) indicates that it is supplementary and permissive rather than mandatory and exclusive. We conclude that the 1969 legislation did not embrace the doctrine of implied repeal and does not preclude the city of Manchester from proceeding under the authority of RSA ch. 205.

Our examination of the pleadings and exhibits in this case, as aided by the briefs of counsel, convinces us that the Redevelopment Project known as Hampshire Plaza serves a public purpose, does not violate our Constitution and has been legally instituted.

*Petition dismissed.*

LAMPRON, J., did not sit; the others concurred.