Board of Tax and Land Appeals
No. 87-137

## APPEAL OF DEBRA A. CHENEY
### (New Hampshire Board of Tax and Land Appeals)

July 8, 1988

*Law Offices of James J. Kalled,* of Ossipee (*John Pierce Kalled* on the brief and orally), for the plaintiff.

*Sulloway, Hollis & Soden,* of Laconia (*John P. Chandler* on the brief and orally), for the defendant, the City of Laconia.

SOUTER, J. This appeal comes from the board of tax and land appeals, which overruled preliminary objections to a city's condemnation of commercial property to create a parking lot. The plaintiff claims that the board erred in rejecting her arguments that (a) the city's procedure deprived her of a constitutionally guaranteed opportunity to object prospectively to the proposal to take her property; that (b) a participating city councilor's conflict of interest rendered the condemnation action voidable; and that neither (c) a public purpose nor (d) a public benefit justifies the taking. We affirm.

In 1984 and 1985 the planning director and other appointed and elected officials of the City of Laconia studied a proposal from a group of local real estate developers and business leaders to redevelop the predominantly commercial area around the city's North Main and Pleasant Streets, the buildings of which then had a vacancy rate of about thirty-five percent. With the help of an outside consultant, the city planning department concluded that a significant cause of the neighborhood's sluggish economy was an insufficiency of parking spaces within a convenient distance of the area's business properties. The planning department's consultant concluded that a distance of more than four hundred feet from a parking space tends to discourage a store's potential customers, a standard of convenience that explained the area's disadvantage in competing with malls in Gilford and Belmont. The four-hundred-foot rule was used to explain why parking could be regarded as inadequate despite the admitted sufficiency of parking spaces within the city as a whole. There were, indeed, at least five parking lots within actual walking distance of the area in question, at least four of which were underused, and one of which was a parking

garage with virtually vacant third level. Each of these parking places, however, was literally or functionally four hundred feet or more from the proposed redevelopment zone, and the space available on the third floor of the garage was unpopular for the further reasons of its inadequate ramps and turning spaces and the perceived risks of vandalism and other petty crime associated with it.

The evidence of parking inadequacy was not unequivocal, however, for a survey conducted by the consultant showed that 71.4% of customers and patrons of businesses in the area usually could find parking near their destination. But neither the consultant nor the city planners regarded this statistic as dispositive, since it reflected the experience of existing customers of businesses in the underutilized district, and could not be taken to indicate that the same available parking space would suffice for the potential demand of a refurbished area occupied by merchants aspiring to compete effectively with the nearby malls.

The city planning department therefore concluded that any practical proposal to renew the area in question must include the creation of new parking spaces. After studying on-street, off-street and elevated parking plans, the department decided the city's best option would be to acquire six buildings, four of which would be razed to provide ninety-one off-street parking spaces, together with a site for installing underground structures to serve buried utility lines, and for planting trees and shrubs to relieve the expanse of asphalt pavement. This was the plan ultimately sent to the city council as one element of a proposal that included the developers' undertakings to invest in the refurbishment of the remaining commercial properties.

The proposal took the form of an application for a so-called Community Development Block Grant of federal funds to help finance the city's participation in the redevelopment project. On June 11, 1985, the council held a public hearing on the proposal and the funding request, at which affected property owners and the general public had an opportunity to express their opinions. The assemblage at the hearing included the plaintiff and her husband, the chief of the Laconia Police Department. The plaintiff's particular concern with the proposal stemmed from her interest in purchasing two of the buildings that would be condemned, which were then owned by one A. W. Sewell, who had used them for some forty years in his business of selling and repairing household appliances. For the four preceding years, the plaintiff had worked

for Mr. Sewell, and she had become interested in buying the business and its premises on Mr. Sewell's imminent retirement.

At the close of the hearing, the city council approved the block grant application as requested, and authorized issuance of municipal bonds to raise one million dollars as a portion of the city's contribution to the project. The plaintiff claims that she never learned about the council's vote and was unaware of the city's commitment to the project until after she had taken title to the affected buildings on November 21, 1985.

On the morning after this transaction, the plaintiff received a formal notice of the city's proposal to take the newly acquired property and its offer to purchase it from her, and for some six months thereafter she and officials of the city corresponded back and forth about the purchase price. At length, there appeared to be little chance of agreement, and on June 10, 1986, the city's community development office petitioned the city council for condemnation of the plaintiff's two buildings. On June 30 the council held a hearing on the petition, at which the plaintiff appeared and spoke in opposition, following which the council voted to condemn the property. Finally, on August 8, 1986, the city filed its declaration of taking with the board of tax and land appeals. RSA 498-A:5.

The plaintiff then raised preliminary objections to the condemnation by challenging the validity of the condemnation procedure and the sufficiency of the city's justification for taking the property. The board provided a "hearing *de novo* on [those] questions of necessity and public use," noting that "federal aid highway funds are not involved." The present appeal is from the board's divided vote to overrule the plaintiff's objections, *see* RSA 71-B:12, and the issue of compensation has yet to be litigated, *see* RSA 498-A:24.

██ Under the familiar statutory standard governing appeals from administrative agencies, the board's findings of fact must be treated as *prima facie* reasonable. RSA 541:13. The administrative action must be affirmed unless it rests upon an error of law, or unless the plaintiff carries her burden to demonstrate "by a clear preponderance" that the board's resolution of an essential issue of fact was unreasonable. *Id.*

We perceive nothing illegal or unreasonable in the board's resolution of the first issue raised in this appeal. The plaintiff argues that the board failed to recognize the unconstitutionality of condemning her property, despite the city council's failure to give her notice of its intentions and an opportunity to be heard prior to its decision to take the buildings. She submits that the council

reached that decision at its June 11, 1985 meeting, when it effectively adopted the proposal calling for the parking lot in question, and she claims that the hearing afforded her a year later, prior to commencing formal condemnation proceedings, thus came too late to satisfy the prior notice and hearing requirement.

This position is not without difficulties. The plaintiff bases her claim of right to a pre-decision hearing on *Merrill v. City of Manchester*, 124 N.H. 8, 466 A.2d 923 (1983) and *Gazzola v. Clements*, 120 N.H. 25, 411 A.2d 147 (1980), each of which rested on an equal protection analysis that the plaintiff has failed to develop in this case. We will assume *arguendo*, however, that such a hearing is required in this case, and we will likewise assume that any owner of property to be affected by this project was entitled to be heard prior to the council's June 11, 1985 decision to expend public funds on the redevelopment proposal. *See Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 758, 423 A.2d 603, 606 (1980) (due process protection requires hearing at a "meaningful" time).

Even with both of these assumptions in her favor, however, the plaintiff's claim for relief still runs afoul of two facts. First, she obtained what she now demands. She attended the June 1985 hearing and, so far as it appears from the record, she had just as free an opportunity as anyone else had to argue against adoption of the proposal. What more she could have asked for is not apparent to us, whether she might have asked in the name of equal protection or of due process.

Second, the plaintiff had no legal or equitable interest in the property at the time of the June 1985 council vote. She therefore had no constitutional or legal claim to any opportunity to protect a property interest that she did not have. *See Appeal of Portsmouth Trust Co.*, *supra* at 756, 423 A.2d at 605 (protected interest is predicate of due process protection). The implication of the plaintiff's position is that whenever there is a sale of property subject to formally adopted governmental plans for public acquisition, the government may be forced to vacate its prior determination to proceed and start over again for the benefit of the new owner. Absent a specific issue of actual or constructive notice of the proposal, however, there is, of course, neither authority nor logic in support of such an astonishing proposition, which if accepted would leave the eminent domain power hobbled to a property purchaser's option to disrupt its exercise. The board properly found no merit in the plaintiff's claim that she had been denied rightful notice and hearing.

The next assignment of error goes to the board's ruling that the plaintiff had waived any right she might have had to object on grounds of conflict of interest to the participation of Councilor Edward Fitzgerald in the votes of the city council that led to the condemnation. The plaintiff urged the board to rule that the councilor had been disqualified to vote because of his interest in a travel agency that occupied leased space in one of the buildings slated to remain in the refurbished area, which presumably would benefit from the enhanced parking capacity. At the 1985 and 1986 hearings, however, the plaintiff raised no objection to Mr. Fitzgerald's participation. Indeed, the record indicates that the plaintiff's silence was probably the result of choice rather than any inability to discover the basis for her present claim, since there was evidence that by the time of the council's second vote, at least, the councilor had become a personal friend of the plaintiff's, with whom she and her husband enjoyed dining out.

The board was undoubtedly correct to rule the conflict claim untimely raised. Interested parties are entitled to object to any error they perceive in governmental proceedings, but they are not entitled to take later advantage of error they could have discovered or chose to ignore at the very moment when it could have been corrected. "We require issues to be raised at the earliest possible time, because trial forums should have a full opportunity to come to sound conclusions and to correct errors in the first instance. This is only fair to the trial forums and the appellate courts." *Sklar Realty v. Town of Merrimack*, 125 N.H. 321, 328, 480 A.2d 149, 153 (1984) (citation omitted). The plaintiff kept silent at the council hearings, and she may not now predicate error on the objection she apparently kept to herself.

We should add, parenthetically, that our resolution of the conflict issue on procedural grounds should not be taken to suggest the plaintiff would necessarily have been entitled to relief even on a timely objection. We have no occasion here to rule on the plaintiff's assumption that Mr. Fitzgerald would have been subject to disqualification and that his participation after objection would have rendered the council's action voidable under *Winslow v. Holderness Planning Board*, 125 N.H. 262, 480 A.2d 114 (1984). The latter assumption, it should be noted, would not be true unless we were to hold that a city council's decision to exercise the power of eminent domain under RSA 31:92 and RSA 44:2 is a quasi-judicial act within the holding of *Winslow. See id.* at 266, 480 A.2d at 116; *cf. Atherton v. Concord*, 109 N.H. 164, 166, 245 A.2d 387, 389 (1968), *overruled in part by Totty v. Grantham Planning Board*, 120 N.H.

388, 415 A.2d 687 (1980) (itself overruled in part by *Winslow v. Holderness Planning Board, supra* at 268, 480 A.2d at 117). Absent such a holding of quasi-judicial character, the significance of any conflict would depend on the rule in *Michael v. City of Rochester*, 119 N.H. 734, 736, 407 A.2d 819, 821 (1979), which would invalidate the official action only if the vote improperly cast determined the outcome. Since the relevant votes at the two hearings were 7 to 2 and 5 to 2, respectively, application of the *Michael* rule would not necessarily invalidate the vote to condemn, even if Mr. Fitzgerald should not have participated.

We should also add that the same finding of waiver disposes of any suggestion that the legality of the project was affected by the participation of another councilor, who had some early involvement in the city's consideration of the project. Finally, the plaintiff's claim that the city's appraiser was tainted by conflict of interest is not properly before us, since the board's action to date, like this appeal, concerned only preliminary objections, not compensation for the taking. It may be assumed that the board's *de novo* consideration of value will obviate any issue about the appraiser's partiality.

■ We come now to the plaintiff's third and fourth challenges, to the board's conclusions that a public purpose justified the proposal to establish the parking lot and that its construction would actually result in a public benefit. The issues thus reflect the content of part I, article 12 of the Constitution of New Hampshire, limiting exercises of the eminent domain power to "public uses," which has been interpreted to require the showing of a public purpose for any taking, *see Merrill v. City of Manchester*, 127 N.H. 234, 236, 499 A.2d 216, 217 (1985) (citing *Velishka v. Nashua*, 99 N.H. 161, 165, 106 A.2d 571, 574 (1954)), and of a probable net benefit to the public if a taking occurs for the intended purpose, *Merrill v. City of Manchester, supra* at 237, 499 A.2d at 217.

■ The board's finding of a public purpose behind the proposal for a parking lot as one element of a plan to foster downtown commercial renewal is, on its face, unexceptionable. It is more than thirty years since this court adopted "[t]he view that redevelopment projects constitute a valid public purpose for which public funds may be appropriated and the power of eminent domain granted" and exercised. *Velishka v. Nashua, supra* at 165, 106 A.2d at 574.

■■ As against a straightforward application of *Velishka*, however, the plaintiff's brief and argument have interposed two objections, neither of which is to the point raised. First, she emphasizes the profit motive of the private developers as a more

probable object of the development and the taking than the accomplishment of any public purpose. But this does not really cut against the relevance of *Velishka* here, for the simple reason that there will always be profit motives and expectations of private success in renewal projects with private participants. So, too, we suppose it is virtually inevitable that such a proposal will attract speculators like those who bought buildings adjacent to the plaintiff's and sold them at a profit in lieu of condemnation. The issue is not whether private participants in such a project hope for and realize private gain, but whether commercial urban refurbishment is a valid public purpose. On analogy with *Velishka*, we hold that it clearly is. When, as here, "a valid public purpose is served, 'the project is not invalidated because private interests may derive incidental benefits.'" *Anderson v. McCann*, 124 N.H. 249, 251, 469 A.2d 1311, 1313 (1983) (quoting *Club Jolliet, Inc. v. Manchester & a.*, 110 N.H. 172, 176, 262 A.2d 844, 847 (1970)).

The second objection to applying *Velishka* raises, as we understand it, an issue entirely different from the identification of a legitimate public purpose. The plaintiff argues that the city has failed to demonstrate that the establishment of the parking area will confer a net benefit on the public, and she thus invokes the rule expressed in *Merrill v. City of Manchester, supra* at 237, 499 A.2d at 217, that article 12 requires a property acquisition subject to the eminent domain power to be justified by the probability of a net benefit to the public over the social cost of the acquisition. While this is, of course, true, public purpose and net public benefit are two different issues, and we reach the latter only when we turn, as we do now, to the plaintiff's fourth assignment of error.

Leaving aside any benefits that may accrue from placement of buried utility facilities under the lot, or from landscaping that may beautify its area, the plaintiff argues that the board still could not reasonably have found the requisite net benefit to the public. She claims that the social cost of acquisition exceeds the public benefit because ninety-one parking spaces were available, or could have been provided, without any need to create the lot in question.

The plaintiff attempts to marshal three sources of support for this position. First, she emphasizes the amount of unused parking space already available within literal walking distance of the redevelopment area. But while there was adequate evidence of such unused space, there was equally adequate evidence to explain why it was unlikely to avail commercial establishments in the affected area. If shoppers will not use the third floor of the existing parking garage, and if they would rather drive to a shopping mall

than walk more than four hundred feet to a downtown store, then the present space simply does not serve the area in question. The board accepted the evidence that existing parking had little value, and we can not say the board was unreasonable in doing so.

 Second, the plaintiff claims that intervening modifications of traffic patterns in the area have already created some thirty new parking spaces, more indeed than would be created by demolishing one of her buildings. But even if we put aside any question about the relevance of post-condemnation developments, there is an answer to this point in another holding of the *Velishka* case. When more than one parcel of land is included in a property acquisition subject to the eminent domain power, the validity of the taking of any one parcel is not to be judged in isolation. *Velishka v. Nashua*, 99 N.H. at 167, 106 A.2d at 574–75. Rather, the question is whether the taking of the plaintiff's property can be viewed as one element of a coherent plan of property acquisition that is justifiable as a whole.

Third, the plaintiff stresses evidence, introduced by her, tending to show that a parking plan could be devised for the existing streets that would create as many spaces as the city would gain from the proposed lot. The plaintiff presented an official of the Laconia Police Department who had prepared just such a plan for angled parking on streets adjacent to the project area, and we suppose that if a majority of the board had found the witness persuasive, the board's decision would have gone the other way. We can only say, however, that accepting or rejecting the witness's proposal was a matter for the board's judgment in finding the facts, and the majority did not lack support for the judgment they made. There was evidence that when the witness drew his plan, he mistakenly applied the standard width of an angled parking space by measuring its distance along the curb rather than at right angles to the side lines of the space, thus seeming to produce more spaces along a given length of curb than the curb could actually accommodate. Hence, the board found that the plaintiff's witness was "a person not expert in either planning or drafting," whose counterproposal would have provided for "substantially fewer parking spaces than the proposed lot if the width of the spaces had been properly calculated" and whose plan was otherwise "inferior to the proposed lot in regard to traffic flow, space for pedestrians, space for utilities, and distance from abutters." There is nothing necessarily unreasonable about these evaluations of the evidence,

and the plaintiff has failed to demonstrate error calling for reversal under RSA 541:13.

*Affirmed.*

All concurred.