Public Utilities Commission
No. 90-406

### APPEAL OF ROBERT C. RICHARDS, EDWARD KAUFMAN AND MARTIN ROCHMAN

### APPEAL OF CAMPAIGN FOR RATEPAYERS RIGHTS AND JOHN V. HILBERG
(New Hampshire Public Utilities Commission)

April 24, 1991

*Robert C. Richards*, of New York, New York, by brief and orally, *pro se*.

*Edward Kaufman*, of Scarsdale, New York, by brief and orally, *pro se*.

*Martin Rochman*, of Palm Beach, Florida, by brief, *pro se*.

*Backus, Meyer & Solomon*, of Manchester (*Robert A. Backus* on the brief and orally), for Campaign for Ratepayers Rights and John Hilberg.

*Rath, Young, Pignatelli and Oyer P.A.*, of Concord, and *Day, Berry and Howard*, of Hartford, Connecticut, for Northeast Utilities Service Company, and *Sulloway Hollis and Soden*, of Concord, for Public Service Company of New Hampshire (*Thomas D. Rath* and *Martin L. Gross* on the brief, and *Mr. Rath* orally).

*John P. Arnold,* attorney general (*Harold T. Judd,* assistant attorney general, on the brief and orally), for the State.

*John J. Lahey* for Business & Industry Association of New Hampshire, and *Michael W. Holmes* for Office of Consumer Advocate, by brief, as *amici curiae.*

PER CURIAM. In these consolidated appeals, the appellants challenge a decision of the New Hampshire Public Utilities Commission (the PUC) approving a rate plan contained in an agreement relating to the reorganization of Public Service Company of New Hampshire (PSNH) that was negotiated by Northeast Utilities Service Company (NU) and the State. This decision was issued in the PUC's docket DR 89-244 and reported in *Re Northeast Utilities/Public Service Company of New Hampshire,* 114 PUR4th 385 (N.H.P.U.C. 1990). The appellants are as follows: Robert C. Richards, Edward Kaufman, and Martin Rochman, who are PSNH stockholders (hereinafter referred to as "the appealing stockholders"); John Hilberg, who is a PSNH ratepayer; and Campaign for Ratepayers Rights (CRR), which is a ratepayer group. The rate plan provides for average base retail rate increases of 5.5% per year for seven years, beginning January 1, 1990, and is an integral part of the agreement whereby NU would acquire PSNH, the State's largest electric utility, for $2.3 billion. Although the appealing stockholders argue that the average base retail rate increases are too low, and Hilberg and CRR argue that they are too high, both sets of appellants contend that the PUC improperly approved the rate plan without a finding that the rates that would be produced by the rate plan are "just and reasonable" in accordance with traditional ratemaking principles. For the reasons that follow, we affirm the PUC's decision and dismiss the appeals.

I. *Facts and Procedural History*

This is an unusual case, in that it involves a public utility that has declared bankruptcy. *See* Darr, *Federal-State Comity in Utility Bankruptcies,* 27 AM. BUS. L.J. 63, 64 (1989). PSNH filed for bankruptcy under chapter 11 of the federal Bankruptcy Code on January 28, 1988, citing as the reasons therefor: the magnitude of its investment in Seabrook Nuclear Generating Station Unit 1 (Seabrook); the delay in obtaining licensing approval from the federal Nuclear Regulatory Commission; and its inability to realize any return on its investment until Seabrook went on line, due to the New Hampshire

Legislature's enactment of RSA 378:30-a, the so-called "anti-CWIP" law, which prohibits utilities from charging rates that would enable them to recover the cost of "construction work in progress." *Re Northeast Utilities, supra* at 391–92.

The bankruptcy court authorized the State to intervene in the proceedings, whereupon the State entered into negotiations with PSNH management and NU, among others, regarding the possible level of rates that could be charged by the reorganized company. *Re Northeast Utilities, supra* at 392. On November 22, 1989, the State and NU signed an agreement which provided for a merger of PSNH with NU, at an acquisition cost of $2.3 billion, and which included the 5.5% rate plan. *Re Northeast Utilities, supra* at 392–93.

In a one-day special session held on December 14, 1989, the legislature adopted a statute which authorized the PUC to review and implement the agreement. This legislation, RSA chapter 362-C (Supp. 1990), became effective on December 18, 1989. The legislature stated that the purpose of the statute was to authorize the PUC

> "to determine whether a proposed agreement relating to the reorganization of Public Service Company of New Hampshire and, upon receipt of required regulatory approvals, the acquisition of Public Service Company of New Hampshire by Northeast Utilities, would be consistent with *the public good* and whether the rates for electric service to be established in connection with the reorganization are *just and reasonable* and should be approved."

RSA 362-C:1, IV (Supp. 1990) (emphasis supplied). To effectuate this purpose, RSA 362-C:3 (Supp. 1990) authorized the PUC,

> "after hearing, in one or more proceedings to be initiated and completed during the pendency of the Public Service Company of New Hampshire bankruptcy, to determine whether the implementation of the agreement would be consistent with *the public good.* If the commission so finds, it shall, notwithstanding any other provision of law, establish and place into effect the levels of rates . . . in accordance with, and during the time periods set forth in, the agreement."

(Emphasis supplied.)

Pursuant to this statute, the PUC held hearings on the merits between April 9 and May 5, 1990, and hearings on rebuttal and supplemental testimony from May 22 to 25, 1990. *Re Northeast Utilities,*

114 PUR4th at 395. Hilberg is the only appellant who was a party to the proceedings before the PUC. In the meantime, the bankruptcy court confirmed NU's reorganization plan on April 20, 1990, *id.* at 393, subject to the PUC's approval of the rate plan. *See* 11 U.S.C. § 1129(a)(6) (1988) (the bankruptcy court's confirmation of a reorganization plan is subject to the approval of any rate change provided for in the plan by any governmental regulatory commission with jurisdiction over the rates of the debtor).

Appellants Richards, Kaufman, and Rochman moved separately to intervene in the proceedings before the PUC, but their motions were denied as untimely. *Re Northeast Utilities*, 114 PUR4th at 395. Appellant Richards thereafter filed a petition in this court, on behalf of himself and appellants Kaufman and Rochman, for a writ of prohibition to the PUC. We denied this petition without prejudice on June 18, 1990. The appealing stockholders are presently appealing the bankruptcy court's confirmation order in federal district court.

The PUC approved the rate plan in an order issued on July 20, 1990. *See id.* at 469–70. The order was accompanied by an extensive written decision, in which the PUC explained its analysis of the average base retail rate increases contained in the rate plan and summarized the evidence supporting its findings. It concluded that "the implementation of the Rate Plan as set forth herein is consistent with the public good . . . and will result in just and reasonable rates that equitably balance the interests of ratepayers and investors." *Id.* at 460.

The PUC reached its decision after comparing the rate of return to the cost of capital under the rate plan. *Id.* at 405–08. It also compared the rates under the rate plan with rates forecast for other New England utilities, *id.* at 411–12, and the rates estimated, insofar as foreseeable, under traditional ratemaking principles, *id.* at 410–11. The PUC stated that the rates resulting from the use of traditional ratemaking methodology would probably be higher than those provided for by the rate plan, but that it was not required to calculate the precise level of rates under traditional ratemaking principles "to determine whether the Rate Plan serves the public good with just and reasonable rates over the fixed rate period." *Id.* at 410. Moreover, it asserted that "[d]etermination of just and reasonable rates by traditional ratemaking methodology, is precluded by the Rate [Plan's] prescribing the level of retail rates over the seven year fixed rate period." *Id.* at 408. The PUC nonetheless estimated the rates that would be achieved under traditional ratemaking principles, insofar as foreseeability permitted. *See id.* at 410.

The appealing stockholders, and Hilberg and CRR, subsequently filed motions for rehearing. The PUC denied their motions on August 17, 1990, and these appeals followed.

## II. *Standing and Preservation of the Issues*

 Before reaching the appellants' arguments, we must first address the contention shared by the State, and NU and PSNH, that the appellants lack standing. For a court to hear a party's complaint, the party must have standing to assert the claim. 59 AM. JUR. 2d *Parties* § 30 (1987); *see also State ex rel. Thomson v. State Bd. of Parole*, 115 N.H. 414, 419, 342 A.2d 634, 637 (1975) (noting that the purpose of the law of standing is to protect against improper plaintiffs). After an administrative agency has denied an individual's motion for rehearing filed pursuant to RSA 541:3, in order to have standing to appeal the agency's decision to this court, he must demonstrate that his rights "may be directly affected" by the decision, *see* RSA 541:3 and :6, or in other words, that he has suffered or will suffer an "injury in fact." *See New Hampshire Bankers' Ass'n v. Nelson*, 113 N.H. 127, 129, 302 A.2d 810, 811 (1973); *see also Blanchard v. Railroad*, 86 N.H. 263, 264–66, 167 A. 158, 159–60 (1933) (holding that a party to an administrative proceeding does not have standing to appeal an administrative agency's decision absent a showing of direct injury). Similarly, a party has standing to raise a constitutional issue only when his own personal rights have been or will be directly and specifically affected. 59 AM. JUR. 2d *Parties* § 33 (1987). Thus, to have standing to appeal the PUC's decision, the appealing stockholders, and Hilberg and CRR, must demonstrate that they have been "directly affected" by it.

In addition, the appellants must show that the issues raised have been properly preserved for appeal. To appeal a decision or order of the PUC, one must first file a motion for rehearing with the PUC stating "fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable." RSA 541:4. A party or any person directly affected by the PUC's decision or order may apply for a rehearing with respect to "any matter determined in the action or proceeding, *or covered or included in the order*." RSA 541:3 (emphasis supplied). If the motion for rehearing is denied, the party may then appeal by petition to this court. RSA 541:6. Issues not raised in the motion for rehearing may not be raised on appeal. *See* RSA 541:4.

## A. *The Appealing Stockholders*

Appellants Richards and Kaufman are holders of PSNH common stock. Appellant Rochman is a beneficial owner of PSNH common stock recorded in his wife's name. Collectively they own 195,000 shares, which is less than one percent of PSNH's outstanding stock. The appealing stockholders assert that the PUC's decision approving the rate plan resulted in a violation of their, and PSNH's, constitutional and statutory rights to recover their "prudent" investment in PSNH plant "used and useful" in the generation of electricity, and that they have been injured, in that the value of their PSNH stock has decreased. They argue that they should be permitted to bring the present appeal in their capacities as individual stockholders or, alternatively, on behalf of PSNH. Because the appealing stockholders have not named PSNH as a party to their appeal, we do not address the issue of whether they have standing to appeal in a derivative capacity. *See Kidd v. Traction Co.*, 72 N.H. 273, 286–88, 56 A. 465, 469 (1903) (stating that a corporation is a necessary party to a derivative action); 13 W. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5997, at 277 (rev. perm. ed. 1984).

In general, a corporation's board of directors, rather than its stockholders, has the authority to bring an action to redress an injury to the corporation. *See* 13 W. FLETCHER, *supra* § 5963, at 111. Nevertheless, a stockholder's rights may be directly affected, entitling him to sue in his individual capacity, "(1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, [or] (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders," 12B W. FLETCHER , *supra* § 5911, at 421, or by the corporation itself, *Gaff v. Federal Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987). A diminution in stock value is an injury that does not fall within either of these two categories and, thus, does not give a stockholder standing to sue on his own behalf. *See Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1113 (D.R.I. 1990).

The appealing stockholders have not alleged a direct injury as a result of the PUC's decision approving the rate plan. Nor have they alleged a constitutional violation of their rights that is distinguishable from a violation of the rights of PSNH or other PSNH stockholders. Accordingly, we hold that they have no standing under RSA chapter 541 to prosecute the present appeal, and, therefore, their appeal is dismissed.

## B. *Appellants Hilberg and CRR*

NU and PSNH contend that appellants Hilberg and CRR also lack standing. Specifically, they argue that Hilberg's status as a ratepayer and the ratepayer status of CRR's members is insufficient to confer standing, absent a showing by Hilberg that he, and by CRR, that its ratepayer members, have been directly affected by the PUC's decision. Hilberg and CRR, on behalf of its ratepayer members, allege that the rate increases that will be imposed upon them as a result of the PUC's approval of the rate plan constitute an "injury in fact" that gives them standing to bring this appeal. In rejoinder, NU and PSNH, citing *Blanchard v. Railroad*, 86 N.H. 263, 167 A. 158 (1933), maintain that the injury alleged by Hilberg and CRR is no different than an injury to the public in general, and that only the Attorney General and the Office of Consumer Advocate are authorized to represent the public in this instance.

██ No individual or group of individuals has standing to appeal when the alleged injury caused by an administrative agency's action affects the public in general, particularly when the affected public interest is represented by an authorized official or agent of the State. *See Blanchard v. Railroad, supra* at 264–65, 167 A. at 159. This is simply another way of formulating the "injury in fact" or "direct effect" requirement. Similarly, an association has no standing to challenge an administrative agency's action based upon a "mere 'interest in a problem.'" *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). It does, however, have standing to represent its members if they have been injured. *Id.*

██ Unlike the plaintiff in *Blanchard v. Railroad*, in which "[t]he only interest alleged to have been infringed by the order is that of the public," *supra* at 264, 167 A. at 158, Hilberg alleges that he, and CRR alleges that its ratepayer members, will suffer a direct economic injury. Courts in other jurisdictions have held that ratepayers are directly affected by rate decisions and, thus, have standing to challenge them. *See Iowa-Ill. Gas & Elec. v. Iowa S. Com. Com'n*, 347 N.W.2d 423, 426–27 (Iowa 1984) (citing cases); *see also City of Houston v. Public Utility Com'n*, 618 S.W.2d 428, 431 (Tex. Civ. App. 1981) (stating that cities, as ratepayers, were "aggrieved" by the public utility commission's order, in that the increase in electric rates imposed upon them an added financial obligation or burden); *Tripps Park v. Pa. Public Utility Com'n*, 415 A.2d 967, 970 (Pa. Commw. Ct. 1980) (holding that Tripps Park, an association whose members in-

cluded utility customers, had standing to appeal a public utility commission rate order). We therefore hold that Hilberg, as a PSNH ratepayer, and CRR, as the representative of its PSNH ratepayer members, have standing to bring this appeal under RSA chapter 541.

NU and PSNH maintain that Hilberg and CRR, even if they have standing to appeal the PUC's decision, have failed to properly preserve their claims for appeal by raising them in a timely manner. In this appeal, Hilberg and CRR argue first that the PUC erred in approving the rate plan, because it failed to employ the proper analysis to determine whether the average base retail rate increases contained in the rate plan will produce rates that are "just and reasonable"; namely, "traditional ratemaking analysis." Second, they assert that the PUC was required to consider whether the placement of PSNH's Seabrook assets into a separate corporation, as provided for by the agreement, would be in the "public good." Finally, they appear to raise a due process issue in their brief, but this argument is merely a restatement of their first argument that the PUC did not properly analyze the rates under the rate plan in accordance with traditional ratemaking principles. Hilberg and CRR included the first issue, and arguably the third, but not the second, as grounds for their joint motion for rehearing filed with the PUC. NU and PSNH argue that these claims were not properly preserved for appeal, because Hilberg and CRR did not raise them during the PUC proceedings or offer any evidence during the proceedings to support them.

 Since Hilberg and CRR did not include the second issue as one of the grounds for their motion for rehearing, they are precluded from raising it on appeal. See RSA 541:4. Additionally, because they made only passing reference to "due process" in their brief, did not cite any constitutional provisions, and did not address this issue during oral argument, we hold that they have not properly preserved the third issue for appeal. See State v. Isaacson, 129 N.H. 438, 439–40, 529 A.2d 923, 924 (1987). However, as to the first issue, we reject NU and PSNH's argument that Hilberg and CRR are barred from raising it on appeal because they did not raise it during the PUC proceedings or offer any evidence during the proceedings to support it. Hilberg and CRR would have been unable to discover the alleged error made by the PUC, i.e., that it used the incorrect analysis to approve the rate plan, prior to the issuance of the PUC's decision. Cf. Appeal of Cheney, 130 N.H. 589, 594, 551 A.2d 164, 167 (1988) (stating that parties "are not entitled to take later advantage of error they could have discovered or chose to ignore at the very moment

when it could have been corrected"). Moreover, this issue is a legal, rather than a factual, one in support of which it was not necessary to introduce additional evidence during the PUC proceedings. Because this issue was discussed by the PUC in its decision and raised in Hilberg and CRR's motion for rehearing, we hold that it is properly raised on appeal.

To summarize, we hold that the appealing stockholders have no standing to bring the present appeal, and that although Hilberg and CRR have standing, they have failed to preserve for appeal the second and third issues raised in their brief.

The sole remaining issue is whether the PUC erred in approving the rate plan, because it failed to employ traditional ratemaking analysis to determine whether the average base retail rate increases contained in the rate plan will produce rates that are "just and reasonable."

### III. *Standard of Review*

In addressing this issue on appeal, we apply the standard of review set forth in RSA 541:13. A party seeking to set aside a decision of the PUC has the burden of demonstrating that the decision is unlawful, or, by a clear preponderance of the evidence, that it is unjust or unreasonable. Additionally, findings of fact made by the PUC are presumed to be *prima facie* lawful and reasonable. RSA 541:13; *see Appeal of Cheney*, 130 N.H. at 592, 551 A.2d at 166.

### IV. *The Analysis Required of the PUC*

In this case, we are dealing with an issue of the delegation of legislative power. Subject to acknowledged constitutional limitations, considered below, the regulation of utilities and the setting of appropriate rates to be charged for public utility products and services is the unique province of the legislature. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313 (1989); *The Minnesota Rate Cases*, 230 U.S. 352, 433 (1913); *see LUCC v. Public Serv. Co. of N.H.*, 119 N.H. 332, 340, 402 A.2d 626, 631 (1979). For substantially all of such regulation, the legislature has recognized the need for expertise not readily available as part of legislative resources, and has therefore delegated its power to a standing regulatory commission of the legislature's creation. RSA ch. 363. The delegated power is exercised in the area of ratemaking, RSA ch. 378, which is conducted through ongoing supervision of rate schedules filed with the PUC. In the traditional ratemaking proceeding, when the utility files for a change in rates under RSA chapter 378, a course of action, well defined by that

chapter, the PUC's regulations and the decisions of this court, is undertaken. In the reorganization of PSNH under the State's agreement with NU, the traditional approach could have been employed, initiated by a PSNH filing for standard and appropriate changes to its existing rates. The rate element of the reorganization could have come to the PUC, in the normal course, under the existing statutory delegation and with all of the judicial requirements attached. However, the rate element of the reorganization was far from traditional, since it envisioned contractual protections for NU, through a contractual guarantee of rates designed to cover the cost of acquisition required to be paid by NU. The contractual rates were intended to be in effect far beyond the period normally and historically appropriate for this utility.

The legislature, citing special needs and circumstances in the situation, RSA 362-C:1 (Supp. 1990), saw fit to provide in this statute a special delegation to the PUC of power to review this agreement. RSA ch. 362-C (Supp. 1990). Its delegating charge was for the PUC to "determine whether the implementation of the agreement would be consistent with the public good." RSA 362-C:3 (Supp. 1990). It charged that, if such a determination is made, "notwithstanding any other provision of law," the contracted rates shall be established and placed in effect for the contracted period. *Id.* In exercise of this authority to determine the public good, the legislature authorized the PUC to inquire into "whether the rates for electric service to be established in connection with the reorganization are just and reasonable and should be approved." RSA 362-C:1, IV (Supp. 1990). The parties disagree as to whether, in such consideration of the rates stipulated by the agreement, by using the phrase "just and reasonable," the legislature intended the PUC to apply traditional ratemaking principles. Hilberg and CRR assert that the statute's reference to the "just and reasonable" standard, which is also found in existing "traditional" ratemaking statutes, *e.g.*, RSA 378:7 and :28, indicates that the legislature wanted the PUC to undertake a traditional ratemaking procedure, and judge the rates under the rate plan according to established "just and reasonable" standards, or, in other words, to conduct a "traditional ratemaking analysis." By "traditional ratemaking analysis," Hilberg and CRR refer to the ratemaking process described in *Appeal of Conservation Law Foundation*, 127 N.H. 606, 507 A.2d 652 (1986).

According to this process, rates are determined using the following formula: $R = O + (B \times r)$, where $R$ = required revenue, $O$ = allowed operating expenses, $B$ = rate base and $r$ = rate of return. *Id.*

at 633, 507 A.2d at 671; *Petition of Public Serv. Co. of N.H.*, 130 N.H. 265, 270–71, 539 A.2d 263, 266 (1988), *appeal dismissed,* 488 U.S. 1035 (1989). The PUC first determines the appropriate values of the three variables in the formula: rate base, rate of return, and the utility's allowed operating expenses. *Appeal of Conservation Law Foundation,* 127 N.H. at 633–40, 507 A.2d at 671–75. Rate base is defined as "'the amount of money that the utility has invested in capital assets (like generating plant and transmission lines) that it uses to provide services to its customers.'" *Id.* at 634, 507 A.2d at 671 (quoting Glicksman, *Allocating the Cost of Construction Excess Capacity: "Who Will Have To Pay For It All?,"* 33 KAN. L. REV. 429, 432 (1985)). It may only include property that is "used and useful" in the generation of electricity, in which the utility's investment was "prudent" at the time made. *Id.* at 637–38, 507 A.2d at 673–74. The rate of return, "a percentage applied to the rate base expressed as a dollar amount in order to produce 'interest on long-term debt, dividends on preferred stock, and earnings on common stock (including surplus or retained earnings),'" *id.* at 635, 507 A.2d at 672 (quoting C. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 332 (1985)), should "yield a return comparable 'to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties[.]'" *Id.* (quoting *Bluefield Co. v. Pub. Serv. Comm.,* 262 U.S. 679, 692 (1923)). Once it has determined the values of the three variables, the PUC then calculates the utility's allowed revenue requirement, from which rates are derived. *Id.* at 633–40, 507 A.2d at 671–75.

Hilberg and CRR note, quoting *Appeal of Conservation Law Foundation,* that "any attempt to judge reasonableness [of rates] apart from [the traditional ratemaking] process would . . . risk . . . unconstitutionality." *See id.* at 639, 507 A.2d at 674. NU and PSNH, on the other hand, maintain that to interpret RSA 362-C:3 (Supp. 1990) as requiring the PUC to apply these statutory ratemaking requirements in its analysis of the rate plan would nullify the statute's purpose, because it would then "be impossible to approve the Rate Agreement." The State, and NU and PSNH, also argue that traditional ratemaking analysis is not constitutionally required. They contend that even if it were required, the PUC satisfied this requirement by finding that the rate plan would be consistent with traditional ratemaking principles.

We note at the outset that the PUC did estimate, insofar as reasonably foreseeable, what rates would be produced using traditional

ratemaking methodology, and that it compared these rates to the rates under the rate plan. *See Re Northeast Utilities*, 114 PUR4th at 410. Hilberg and CRR apparently claim that this comparison was invalid, because the PUC was required to, but did not, conduct a full-blown ratemaking proceeding, as part of which a determination of the "prudent" and "used and useful" value of Seabrook would be made. We base our discussion on this characterization of their argument.

### A. *Under RSA 362-C:3*

To resolve Hilberg and CRR's argument that RSA 362-C:3 (Supp. 1990) obligated the PUC to apply traditional ratemaking principles in its analysis of the rates under the rate plan, "principles of statutory interpretation require us to look first to the statutory language itself," *Petition of Jane Doe*, 132 N.H. 270, 276, 564 A.2d 433, 438 (1989), for the words used in the statute are the best indication of legislative intent. *See Chambers v. Geiger*, 133 N.H. 149, 152, 573 A.2d 1356, 1357 (1990). When possible, a statute will be interpreted in a manner consistent with its plain meaning. *Petition of Jane Doe*, 132 N.H. at 276–77, 564 A.2d at 438. "We also examine a statute in relation to the statutory scheme." *State v. Taylor*, 132 N.H. 314, 318, 566 A.2d 172, 174 (1989).

The operative section of RSA chapter 362-C, section 3, provides:

> "The commission is authorized . . . to determine whether the implementation of the agreement would be consistent with *the public good.* If the commission so finds, it shall, *notwithstanding any other provision of law*, establish and place into effect the levels of rates . . . in accordance with, and during the time periods set forth in, the agreement."

(Emphasis supplied.) In making this determination of consistency with the public good, RSA 362-C:3 (Supp. 1990) authorizes the PUC to determine whether the rate plan contained in the agreement will produce rates that are "just and reasonable and should be approved." Since this consideration is specifically mentioned in RSA 362-C:1, IV (Supp. 1990), it is essential to the operative determination of public good. *State v. Perra*, 127 N.H. 533, 537, 503 A.2d 814, 816–17 (1985) (stating that statutes shall be interpreted to effectuate the legislature's expressed intent). RSA 362-C:3 (Supp. 1990) does not, however, expressly require the PUC to undertake any particular analysis of the rate plan.

Hilberg and CRR argue that, because the legislature in its declaration of purpose and findings specifically used the phrase "just and

reasonable," a term of art found in traditional ratemaking statutes, it intended the PUC to use traditional ratemaking analysis to assess the rates under the rate plan.

■ It does not follow from the fact that the phrase "just and reasonable" is used in traditional ratemaking statutes that these statutes apply in the present case. In *Petition of Public Service Co. of New Hampshire*, a case decided subsequent to our decision in *Appeal of Conservation Law Foundation*, we stated that in the constitutional sense of the phrase,

> "[a] just and reasonable rate is one that, after consideration of the relevant competing interests, falls within the zone of reasonableness between confiscation of utility property or investment interests and ratepayer exploitation."

130 N.H. at 274, 539 A.2d at 268. Thus, we have recognized two "just and reasonable" standards: a statutory standard and a broader, constitutional standard. The question that remains is whether the legislature intended the statutory "just and reasonable" standard to apply in addition to the constitutional "just and reasonable" standard.

It is significant that the only place the phrase "just and reasonable" appears in RSA chapter 362-C (Supp. 1990) is in its "Declaration of Purpose and Findings," RSA 362-C:1 (Supp. 1990), and not in RSA 362-C:3 (Supp. 1990), the operative section. That the legislature used the phrase only in the declaration of purpose and findings section is consistent with a determination that it was using the phrase in the broader, constitutional sense, rather than in the more specific, statutory sense. The legislature's omission of the phrase "just and reasonable" from RSA 362-C:3 (Supp. 1990), entitled "Action by the Commission," indicates that the legislature did not intend to require the PUC to undertake traditional ratemaking analysis. Had the legislature intended the PUC to do so, it could easily have made this an express requirement. It is not the function of this court to add provisions to the statute that the legislature did not see fit to include. *Sigel v. Boston & Maine R.R.*, 107 N.H. 8, 23, 216 A.2d 794, 805 (1966). Furthermore, the legislature's mandate that, having determined public good, the contracted rates are to be implemented as agreed, "notwithstanding any other provision of law," calls more for contract review and ratification than for creative ratemaking.

Interpreting RSA 362-C:3 (Supp. 1990) so as to require the PUC to use traditional ratemaking analysis would also directly contravene the express intent of the legislature in enacting RSA chapter 362-C

(Supp. 1990). *Cf. Quality Carpets, Inc. v. Carter*, 133 N.H. 887, 889, 587 A.2d 254, 255 (1991) (stating that "[w]e will construe statutes 'so as to effectuate their evident purpose'" (quoting *State v. Sweeney*, 90 N.H. 127, 128, 5 A.2d 41, 41 (1939))). The legislature stated the following as reasons for its enactment of RSA chapter 362-C (Supp. 1990):

> "I. The health, safety and welfare of the people of the state of New Hampshire and orderly growth of the state's economy require that there be a sound system for the furnishing of electric service.
>
> II. The bankruptcy of the state's largest electric utility, Public Service Company of New Hampshire, has threatened the adequacy, reliability and cost of electric service.
>
> III. The present and predicted growth in electric service demands in the state of New Hampshire requires a prompt resolution of the bankruptcy and reorganization of Public Service Company of New Hampshire."

The predominant purpose of RSA chapter 362-C (Supp. 1990) was to expedite the resolution of the PSNH bankruptcy by authorizing the PUC, upon a finding of public good, to approve and implement the agreement, which would resolve the PSNH bankruptcy by providing for a reorganization of the utility.

An effort at traditional ratemaking would involve a complex process which, as we noted above, consists of a number of steps. *See Appeal of Conservation Law Foundation*, 127 N.H. at 633–40, 507 A.2d at 671–75. If RSA 362-C:3 (Supp. 1990) were interpreted as Hilberg and CRR suggest, the PUC essentially would be required to hold a ratemaking proceeding which could take as long as one or two years. *See* C. PHILLIPS, JR., THE REGULATION OF PUBLIC UTILITIES 732 (1985) (stating that "'[f]rom start to finish, the proceedings averaged more than . . . 21 months for ratemaking.'" (quoting 4 SENATE COMM. ON GOVERNMENTAL AFFAIRS, STUDY ON FEDERAL REGULATION, 95th Cong., 1st Sess. 7 (1977))). As a consequence of this interpretation of RSA 362-C:3 (Supp. 1990), the resolution of the PSNH bankruptcy would be delayed rather than expedited, a result that was clearly not intended by the legislature. Further, the agreement was not an appropriate subject for traditional ratemaking. Its contractual nature, its stipulated rate base and its extended term would have made traditional ratemaking a sham or exercise in futility.

█ Based upon the foregoing analysis, we hold that RSA 362-C:3 (Supp. 1990) did not require the PUC to analyze the rate plan in accordance with traditional ratemaking principles. By using the phrase "just and reasonable," the legislature referred to the constitutional "just and reasonable" standard, rather than the "just and reasonable" standard found in traditional ratemaking statutes, applicable to traditional ratemaking procedures, and discussed in *Appeal of Conservation Law Foundation.*

### B. *Under Constitutional Law*

Hilberg and CRR also appear to argue that the PUC was constitutionally required to apply traditional ratemaking analysis. Again, they cite *Appeal of Conservation Law Foundation* as authority. In *Appeal of Conservation Law Foundation,* we noted that "any attempt to judge reasonableness [of rates] apart from [the traditional ratemaking] process would . . . risk . . . unconstitutionality." 127 N.H. at 639, 507 A.2d at 674. We did not, however, foreclose the possibility that there existed other constitutionally permissible means of determining "just and reasonable" rates, nor should our holding in that case be construed as unconditionally requiring the use of that traditional ratemaking methodology.

A holding that the use of that traditional ratemaking formula is constitutionally required would be contrary to well-established federal constitutional case law. In *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591 (1944), the seminal case in this area, the United States Supreme Court held that the Federal Natural Gas Act, 15 U.S.C. § 717 (1988), does not require the use of any particular formula in determining rates. *Id.* at 602. The Court stated that the methodology used to set rates is irrelevant. *See id.* Instead, it is the result reached that is important: "[i]f the total effect of the rate order cannot be said to be unjust or unreasonable, judicial inquiry . . . is at an end." *Id.* Although the Court decided the case under the Federal Natural Gas Act, it noted that "there are no constitutional requirements more exacting than the standards of the Act." *Id.* at 607.

█ The holding in *Hope* has been followed in numerous subsequent Supreme Court cases. In *Wisconsin v. Federal Power Commission,* 373 U.S. 294 (1963), the Court stated:

"[T]o declare that a particular method of rate regulation is so sanctified as to make it highly unlikely that any other method could be sustained would be wholly out of keeping

with this Court's consistent and clearly articulated approach to the question of the [Federal Power] Commission's power to regulate rates. *It has repeatedly been stated that no single method need be followed by the Commission in considering the justness and reasonableness of rates."*

*Id.* at 309 (emphasis supplied). Most recently, in *Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989), the Court reaffirmed the principle that "'[i]t is not the theory, but the impact of the rate order which counts.'" *Id.* at 314 (quoting *Hope*, 320 U.S. at 602); *see also Petition of Public Serv. Co. of N.H.*, 130 N.H. at 275, 539 A.2d at 268 (stating that the Federal Constitution is concerned with only the end result of a rate order). Accordingly, the PUC was not constitutionally required to apply traditional ratemaking principles in its analysis of the rates under the rate plan.

## V. *Conclusion*

In conclusion, we hold that RSA 362-C:3 (Supp. 1990) did not obligate the PUC to analyze the rate plan in accordance with traditional ratemaking principles, nor would such methodology be practical or consistent with the legislative delegation. Further, we hold that traditional ratemaking analysis was not constitutionally required in this case. Since Hilberg and CRR neither argue nor demonstrate that the total effect of the rate plan is unjust or unreasonable, we hold that they have failed to sustain their burden of proof to show that the PUC's decision approving the rate plan was unlawful or unreasonable. Therefore, the PUC's decision must be affirmed. *See Appeal of Cheney*, 130 N.H. at 592, 551 A.2d at 166.

*Affirmed; appeals dismissed.*

BROCK, C.J., and BATCHELDER, J., dissented.

BROCK, C.J., and BATCHELDER, J., dissenting: In this appeal we are asked to determine the legislative intent behind RSA 362-C:3 (Supp. 1990), specifically, whether the legislature intended to require the PUC to analyze the rates under the rate plan negotiated by NU and the State in accordance with existing statutory ratemaking standards. Our decision today will affect electric ratepayers all over New Hampshire for the period remaining under the rate plan and perhaps longer. For the reasons hereinafter set forth, we believe that the majority has incorrectly interpreted RSA 362-C:3 (Supp. 1990) to reach a result that was not intended by the legislature, and, in

addition, that they have misapprehended federal constitutional rate-making requirements discussed both in federal cases and in the decisions of this court.

### I. *The Statutory "Just and Reasonable" Standard is Presumed to Apply*

Reading RSA 362-C:3 (Supp. 1990) to effectuate one of the legislature's express purposes in enacting RSA chapter 362-C (Supp. 1990), *see* 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 58.06, at 723 (Sands 4th ed. 1984), it is clear that the PUC was required to determine whether the rates under the rate plan are "just and reasonable." Although not defined in RSA chapter 362-C (Supp. 1990), "just and reasonable" is a term of art used in RSA 378:7. RSA 378:7, entitled "Fixing of Rates by Commission," requires the PUC to set "just and reasonable" rates, or rates that are "sufficient to yield not less that a reasonable return on the cost of the property of the utility used and useful in the public service less accrued depreciation." *See* RSA 378:27 and :28. According to well established canons of statutory construction, it is assumed not only that the legislature was aware of this statutory "just and reasonable" standard, *see Wyatt v. Board of Equalization*, 74 N.H. 552, 557, 70 A. 387, 390 (1908) (stating that a statute "must be read in the light of the circumstances then existing," including "the law as it was then declared"), but that, by using the term "just and reasonable" when it enacted RSA chapter 362-C (Supp. 1990), the legislature intended this standard to apply.

> "'It is assumed that whenever the legislature enacts a provision, it has in mind previous statutes relating to the same subject matter. . . .
>
> . . . .
>
> Unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter *will* be construed in the same sense.'"

*Appeal of Town of Hampton Falls*, 126 N.H. 805, 809–10, 498 A.2d 304, 307 (1985) (emphasis added) (quoting 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.02, at 453-54 (Sands 4th ed. 1984) (footnotes omitted)).

This court further defined the term "just and reasonable" in *Appeal of Conservation Law Foundation*, 127 N.H. 606, 507 A.2d 652 (1986). In that case, we stated that, given the above-cited statutes, the term "reasonable" or "just and reasonable" rate

*"must be understood as referring to the result of the rate-making process.* The ratemaking process fixes rates that will satisfy a utility's revenue requirement. Reduced to its essentials, this revenue requirement *may* be expressed as a formula: $R = O + (B \times r)$, where R is the utility's allowed revenue requirement; O is its allowed operating expense; B is its rate base, defined as cost less depreciation of the utility's property that is used and useful in the public service, *see* RSA 378:27; and r is the rate of return allowed on the rate base."

*Id.* at 633–34, 507 A.2d at 671 (emphasis added). The court went on to discuss at some length "both the standard of reasonable rates and the commission's responsibility in light of that standard." *Id.* at 633, 507 A.2d at 671.

There is nothing in either the language or the legislative history of RSA chapter 362-C (Supp. 1990) to rebut the presumption that the legislature intended the phrase "just and reasonable" to refer to the statutory "just and reasonable" standard. The legislature's use of the phrase "notwithstanding any other provision of law" does not, contrary to what NU and PSNH argue, indicate that it did not intend the statutory "just and reasonable" standard to apply, because this language neither limits nor describes the analysis the PUC was required to undertake in order to assess the reasonableness of the rates under the rate plan. Nor does the fact that the phrase "just and reasonable" appears only in RSA 362-C:1 (Supp. 1990), entitled "Declaration of Purpose and Findings," mean that the legislature was using it in its broader, constitutional sense. It is only logical that this phrase, provided that it is used in the same context, has the same meaning regardless of its location in the statutory scheme. Additionally, the legislative history of RSA chapter 362-C (Supp. 1990) provides no indication that the legislature intended any standard other than the statutory "just and reasonable" standard to apply. Therefore, RSA 362-C:3 (Supp. 1990) required the PUC to determine whether the rates under the rate plan met the statutory "just and reasonable" standard discussed in *Appeal of Conservation Law Foundation.*

Such an interpretation of the statute does not, as the majority suggests, contravene the legislature's apparent intent to expedite the resolution of the PSNH bankruptcy. The assumption underlying the majority's decision is that the legislature wanted to expedite the resolution of the PSNH bankruptcy by ensuring that the PUC would be

able to approve and implement the agreement, including the rate plan, as quickly as possible. A close look at the plain language of RSA chapter 362-C (Supp. 1990) and its legislative history, however, reveal this assumption to be unfounded.

When it enacted RSA chapter 362-C (Supp. 1990), the legislature stated that the PUC "should be authorized to determine . . . whether the rates for electric service to be established [under the rate plan contained in the agreement] . . . *should be approved.*" RSA 362-C:1, IV (Supp. 1990) (emphasis added). The legislature clearly did not intend the PUC to rubberstamp the rate plan. If the legislature had wanted the rate plan to be approved, it simply could have enacted legislation approving the rate plan. It is well established that the legislature has the authority to set utility rates. *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 313 (1989); *The Minnesota Rate Cases*, 230 U.S. 352, 433 (1913) (stating that "[t]he rate-making power is a legislative power and necessarily implies a range of legislative discretion"). Thus, there was no reason for the legislature to delegate this authority to the PUC, unless it wanted the PUC to use its expertise to analyze the rate plan. The PUC has expertise in determining whether rates are "just and reasonable," which it has obtained as a result of holding numerous ratemaking proceedings in accordance with the applicable ratemaking statutes. By delegating the authority to approve the rate plan to the PUC without any further instructions, it follows that the legislature intended the PUC to conduct its customary analysis of the rates under the rate plan, whereby it would determine whether the rates met the statutory "just and reasonable" standard. This reading of the statute is consistent with the legislative history of RSA chapter 362-C (Supp. 1990): "This bill authorizes the PUC to conduct a *full and complete review* of the rate agreement . . . . In other words, it delegates to the PUC the authority to perform an *expert review* of the technical terms of the Agreement." N.H.H.R. JOUR. 8 (Special Session, December 14, 1989) (emphasis added).

The legislature desired a prompt resolution of the PSNH bankruptcy, but it desired more. It also wanted to ensure that the rate plan would not unduly burden its ratepayer constituents. A prompt resolution of the PSNH bankruptcy and a careful review of the rate plan in accordance with traditional ratemaking principles were not, however, mutually exclusive goals. Moreover, the enormity of the undertaking involved in this case, namely, the decision whether or not to implement a rate plan calling for seven years of rate increases, warranted a conservative approach in determining the fairness of

the rate plan, rather than the conclusory treatment engaged in by the PUC. The legislature had sound reason to expect the former; otherwise, it could have adopted the rate plan by statute and shunted the PUC from any participation in this process.

## II. *The Reasonableness of Rates Must Be Assessed in the Context of the Ratemaking Process*

Principles of federal constitutional law also required the PUC to assess the reasonableness of the rates under the rate plan in the context of the ratemaking process. The establishment of "just and reasonable" rates involves a balancing of investor and ratepayer interests, *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 603 (1944), which occurs when rates are determined in accordance with traditional ratemaking principles, *see Appeal of Conservation Law Foundation*, 127 N.H. at 633, 507 A.2d at 671 (stating that the traditional ratemaking process "appropriately balances the competing interests of ratepayers who desire the lowest possible rates and investors who desire rates that are higher"). By determining a proper rate base value and by allowing a reasonable rate of return on that rate base, the PUC ensures that ratepayers do not pay excessive rates and, in addition, guarantees investors an adequate return on their investment. "[W]hether a particular rate is 'unjust' or 'unreasonable' will depend to some extent on what is a fair rate of return given the risks under a particular ratesetting system, and on the amount of capital upon which the investors are entitled to earn that return." *Duquesne*, 488 U.S. at 310.

Although the United States Supreme Court has often stated that there is no constitutionally required ratemaking methodology or formula, *Duquesne*, 488 U.S. at 316; *Colorado Interstate Co. v. Comm'n*, 324 U.S. 581, 605 (1945); *Hope*, 320 U.S. at 602, it must be remembered that in these cases the applicability of the traditional ratemaking process itself was not at issue, but rather some specific aspect of the ratemaking process, for example, rate base. *See Duquesne*, 488 U.S. at 301–02; *Colorado Interstate Co. v. Comm'n*, 324 U.S. at 604–05; *Hope*, 320 U.S. at 603; *see also Wisconsin v. Fed. Power Comm'n*, 373 U.S. 294, 308–10 (1963) (holding that establishing rates on an area-wide, as opposed to an individual company basis is not unconstitutional); *Power Comm'n v. Pipeline Co.*, 315 U.S. 575 (1942) (upholding the Federal Power Commission's findings as to rate base, amortization period, amortization interest rate, and rate of return). By stating that there is no single ratemaking formula, the Court apparently meant that there was no required formula for determin-

ing any of the three variables used in the traditional ratemaking process, such as rate base. *Accord Appeal of Conservation Law Foundation*, 127 N.H. at 637, 507 A.2d at 673 (citing cases). Its holdings should not be read as broadly as the majority suggests, to stand for the proposition that rates may be found to be "just and reasonable," in the constitutional sense of the phrase, without reference to the traditional ratemaking process. In this instance, "traditional ratemaking process" refers to the general ratemaking process, whereby rates are determined in relation to the proper rate base and rate of return. This process *may* be expressed as the following formula: R = O + (B x r); but use of this specific formula is not necessarily required. *See id.* at 633, 507 A.2d at 671. What *is* required is that, in determining whether rates are "just and reasonable," a utilities commission consider the proper rate base and rate of return, which in this case the PUC failed to do.

In *Appeal of Conservation Law Foundation*, this court noted that any attempt to determine the reasonableness of rates apart from the general ratemaking process described in that case would entail the risk of unconstitutionality. 127 N.H. at 639, 507 A.2d at 675.

> "This is so, not because the State or Federal Constitution guarantees a particular rate, but because existing concepts of the constitutional limits of ratemaking have been developed in the context of a process that does not determine how far to recognize one competing interest in isolation from the other. That process has been described metaphorically as a "constitutional calculus" in which the interests of investors, like the interests of customers, are variables. Consequently, any criterion of reasonableness that might be applied independently from the balancing process that does reflect such interests would run the risk of unconstitutionality by inviting the fixing of rates without regard to the balancing of interests."

*Id.* (citations omitted). Similarly, in *Company v. State*, 95 N.H. 353, 64 A.2d 9 (1949), we stated that

> "in the *Hope* case, as in subsequent decisions called to our attention, the findings of the regulatory body whose orders were sustained disclosed a rational process by which a rate base and a rate of return were determined and applied, to produce the return translated into rates, or in default thereof, the case was remanded for further findings."

*Id.* at 357, 64 A.2d at 14. Reading the above-cited cases in a consistent manner, they teach us that, although there is no constitutionally required formula for determining rate base, or the other variables used in traditional ratemaking methodology, rates cannot pass constitutional muster unless they have been determined in relation to the proper rate base and rate of return, or in other words, in accordance with the traditional ratemaking process.

III. *The PUC's Analysis of the Rate Plan*

In the present case, the comparison made by the PUC between the rates under the rate plan and the estimated traditional rates for the same period was invalid, because the PUC did not properly determine the rates likely under traditional ratemaking methodology. Instead of determining the applicable rate base by calculating the value of PSNH's *prudent* investment in property used and useful in the generation of electricity, the PUC *assumed* the applicable rate base to be $2.3 billion, NU's acquisition cost of PSNH contained in the agreement. *Re Northeast Utilities/Public Service Company of New Hampshire,* 114 PUR4th 385, 410 (N.H.P.U.C. 1990). It did so in spite of its previous decision in *Re Public Service Co. of New Hampshire,* 66 PUR4th 349 (N.H.P.U.C. 1985), in which it stated that

> "[r]easonable rates on a just and reasonable rate base cannot be finally prescribed without a prudency determination of the capital investment in rate base.
>
> . . . .
>
> We cannot prejudge the reasonableness of rates or make a definitive finding that rates resulting from the capital investment in Seabrook are unduly burdensome without first finding the prudent investment to which they relate. . . . We are bound by the New Hampshire and federal Constitutions to assure that ultimately PSNH will receive just compensation through rates on prudent investment. While there are constitutional guarantees of the opportunity to earn a fair return, rates may not be 'prohibitive, exorbitant, or unduly burdensome to the public.' The essential reconciliation of prudent investment and reasonable, not unduly burdensome rates may be accomplished in a rate proceeding when PSNH seeks rate support for the addition of Seabrook to its rate base. *A prudency investigation should be initiated by the commission on a timely basis to assure an in-depth anal-*

> ysis of prudent investment and the reasonable rate level for
> a fair return to investors without unduly burdening rate-
> payers."

*Id.* at 424 (emphasis added) (citations omitted) (quoting *S.W. Tel. Co. v. Pub. Serv. Comm.*, 262 U.S. 276, 290 n.2 (1923) (Brandeis, J., dissenting)).

The PUC arrived at this $2.3 billion figure by finding the value of Seabrook to be $700 million and the value of PSNH's non-Seabrook assets to be $800 million. The remaining $800 million was labeled as an "acquisition premium." It does not appear, however, that the $800 million "acquisition premium" represents the value of any particular utility property, so as to be properly included in rate base. *See Re Northeast Utilities*, 114 PUR4th at 467–68 (the PUC's rulings on Hydro Intervenors' requested findings numbers 3 and 7). The $800 million acquisition premium does not legitimately bridge the gap between the value of PSNH's assets and the price to be paid for PSNH by NU, and is of little solace to a ratepayer who is forced to contribute to a return on that asset which presumably does not generate electricity but merely helps to indemnify junk bondholders. *See Appeal of Conservation Law Foundation*, 127 N.H. at 650–51, 507 A.2d at 682–83 (King, C.J., and Batchelder, J., dissenting).

Since the PUC did not calculate the applicable rate base value, it was unable to properly determine the rates likely under traditional ratemaking methodology and compare them to the rates that will be produced by the rate plan. Therefore, the PUC erred in approving the rate plan, because it did not properly determine whether the rates that would be established by the rate plan are "just and reasonable."

## IV. *Conclusion*

In this case, the legislature contemplated, and ratepayers and investors alike were entitled to, a careful and thorough review of the rate plan by the PUC in accordance with traditional ratemaking principles. Yet the PUC, instead of determining whether the rates that New Hampshire ratepayers will be charged under the rate plan are "just and reasonable," focused its inquiry upon whether the "rate plan yields the minimum rates necessary to finance the payment of the $2.3 billion bankruptcy compromise to PSNH creditors and equity holders without unduly burdening ratepayers or the N.H. economy." *Re Northeast Utilities*, 114 PUR4th at 405. Although the PUC cited *Appeal of Conservation Law Foundation* in its decision,

apparently it did not fully comprehend the requirements this case imposes. As a result of its cursory analysis of the rate plan, ratepayers may now be unjustly locked into a rate plan which not only provides for seven consecutive years of rate increases totaling, on a cumulative basis, approximately forty-five percent, *Re Northeast Utilities*, 114 PUR4th at 410, but which contains a return on equity "collar" and "ceiling" which allow for further increases, *id.* at 418.

The PUC, which five short years ago refused to consider the potential effect of a PSNH bankruptcy, *see Appeal of Conservation Law Foundation*, 127 N.H. at 670, 507 A.2d at 695–96 (King, C.J., and Batchelder, J., dissenting), in authorizing the further borrowing of hundreds of millions of dollars for the completion of Seabrook Unit I at its then-projected completion cost of $4.7 billion dollars, *id.* at 648–49, 507 A.2d at 681, has once again fallen short of the mark which the New Hampshire Legislature and ratepayers should reasonably expect of it in the performance of its high constitutional duty. It has found a schedule of rate increases to be in the public good without determining in the first instance whether they are "just and reasonable" as that term has been used by this court, the United States Supreme Court, the New Hampshire Legislature, and its own decisions.

The decision of the court today jeopardizes New Hampshire ratepayers' interest in receiving adequate utility service at a fair cost, because it results in the establishment of a schedule of electric rates that must be borne by ratepayers over a period of years without an oft-promised prudency hearing concerning PSNH's investment in Seabrook, *see Re Public Service Co. of New Hampshire*, 66 PUR4th at 424, which now exceeds $6.5 billion, *Re Northeast Utilities*, 114 PUR4th at 392 (as of January 1, 1990, the total cost of Seabrook, including all direct costs and interest charges, was approximately $6.5 billion). For the reasons set forth herein, we would remand this matter to the PUC for its appropriate inquiry, and accordingly, we respectfully dissent from today's per curiam opinion of the court.